787 So.2d 446 (2001)
Louis COLEMAN, Individually and as Father of Louis Frank Coleman
v.
Dr. Richard DENO, Dr. Ivan Sherman and JoEllen Smith Hospital.
No. 99-CA-2998.
Court of Appeal of Louisiana, Fourth Circuit.
April 25, 2001.
*454 Michelle A. Bourque, Jones, Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P., New Orleans, Counsel for Intervenor/Appellant.
Gerald E. Meunier, Darryl M. Phillips, Gainsburgh, Benjamin, David, Meunier & Warshauer, Frank J. D'Amico, Jr., New Orleans, Counsel for Plaintiff-Appellant.
Stewart E. Niles, Jr., Charles L. Rice, Jr., Karen M. Fontana, Jones, Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P., New Orleans, Counsel for Defendant-Appellant.
C. William Bradley, Jr., Richard E. Gruner, Jr., Colleen B. Hand, Lemle & Kelleher, L.L.P., New Orleans, Counsel for Defendant/Appellee.
Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER, Judge DENNIS R. BAGNERIS, Sr., and Judge MICHAEL E. KIRBY.
BYRNES, Chief Judge.
This medical malpractice and general tort case involves the loss of plaintiff's arm. The plaintiff, Louis Coleman, defendant Dr. Richard Deno, and the intervenor, the Louisiana Patients' Compensation Fund ("Patients' Compensation Fund" or "Fund"), appeal a judgment notwithstanding the verdict ("JNOV"), which dismissed the plaintiff's claims and award against Dr. Ivan Sherman. The trial court also lowered the jury award to the plaintiff, Louis Coleman, on behalf of his son, Louis Frank Coleman, for loss of consortium. We affirm in part, amend in part, and reverse in part.
On June 7, 1988 at 1:44 a.m., plaintiff, Louis Coleman went to the emergency room of JoEllen Smith Hospital where he complained to the nurse that he had pulled something in his chest while lifting, and all movements hurt, including deep breathing. Although his vital signs were normal, he had a fever of 100.3.
Dr. Ivan Sherman, the attending emergency physician, found that the plaintiff's chest was clear but his chest wall was tender. Dr. Sherman diagnosed plaintiff with chest pain and costochondritis. Dr. Sherman prescribed Naprosyn twice a day with meals. Plaintiff was discharged at 3:45 a.m. with instructions to apply heat to his chest and to see his personal physician for a follow up examination. Plaintiff filled his prescription that morning and went home. His left arm began to swell later that morning.
On June 8, 1988 at 8:10 p.m. plaintiff went to the emergency room at JoEllen Smith Hospital, complaining to the nurse that his left arm had begun to swell and ache that morning. The nurse noted that his arm was swollen and warm with bullae in the left atecubital space. Plaintiff's vital signs were normal although he had an elevated heart rate of 120/minute and a fever of 102.8.
When Dr. Richard Deno, the attending emergency room physician, first examined the plaintiff, he noted track marks consistent with intravenous drug use. Dr. Deno drew a diagram of plaintiff's left arm, showing the location of the track marks, the hot swollen area, and the small bullous lesions. Dr. Deno ordered laboratory work that showed a white blood cell count of 27.1. Dr. Deno diagnosed the plaintiff *455 with left arm cellulitis and concluded that the plaintiff needed inpatient intravenous antibiotic therapy. Dr. Deno felt that the patient could receive better treatment at Charity Hospital of New Orleans ("Charity"), which had superior and more immediately available health care services for treatment of plaintiff's left arm while JoEllen Smith Hospital did not have the full laboratory facilities available at Charity. Dr. Deno called the resident in charge of Charity's Accident Room, and the resident accepted plaintiff for immediate admission to the emergency room.
Dr. Deno determined that the plaintiff was stable and could transport himself to Charity. Dr. Deno instructed the plaintiff to go directly to Charity. He was given a copy of his laboratory results and discharged from JoEllen Smith Hospital at about 10:00 p.m.
The plaintiff arrived at Charity over 2½ hours later at 12:21 a.m. on June 9, 1988. He told the nurse that his chief complaint was of left arm edema for one day. Plaintiff related that he had a crushing type injury on Sunday when he fell off of a boat and was wedged between the wharf and the boat.
The attending physician noted a small painful and erythematous region approximately one to two inches below the left elbow on the anterior part of the plaintiff's forearm on the morning prior to admission. By that evening plaintiff had swelling up to his elbow, and later that evening he had extremely painful swelling extending into his arm. Plaintiff related that the only recent trauma to his left arm occurred four days before admission when some people injected something into his arm while holding him down. Plaintiff stated that he worked unloading seafood crates from a truck but did not work directly with fish or oysters. He denied having recent cuts while working. He also reported that he fell from a boat five days earlier and was wedged between the bank and the wharf. Plaintiff denied IV drug use although a questionable history of IV drug use was noted.
Plaintiff's physical examination showed that his left upper extremity was swollen and warm from the mid arm to lower forearm, with no fluctuant areas, no streaking, positive axillary node and positive track marks. Plaintiff's white blood cell count was elevated at 29.9. The left arm x-rays, which were completed by 5:00 a.m., showed significant soft tissue swelling but no gas in the tissues. The x-rays demonstrated deformities of the second, third, fourth and fifth digits.
The attending physician diagnosed cellulitis, probable intravenous drug abuse, and noted likely staph or strep infection, ruling out sepsis. The physician determined that the plaintiff should be admitted for intravenous antibiotics (Nafcillin, 2 grams every four hours), tetanus toxoid administration, elevation of warm compresses to the left arm, and additional blood studies.
Seven hours after the plaintiff arrived at the Charity Emergency Room, intravenous antibiotics were initiated at 8:00 a.m. The June 9, 1988 nurse's notes did not show additional swelling or worsening of the plaintiff's left arm. After receiving intravenous antibiotics throughout the day, the plaintiff was admitted to the Hospital's LSU Medicine Service at 6:00 p.m.
At Charity, the attending physician initially noted on June 10, 1988 that he was waiting for the results of blood tests of the plaintiff's blood culture and white blood count to determine the length of the antibiotic treatment, and he planned to consult surgery.
On June 11, 1988 the hospital notes report that the cellulitis with staph was responding to treatment with Nafcillin. After *456 a surgical consult was ordered to evaluate the plaintiff's left arm cellulitis on June 11, 1988, Dr. Clyde R. Redmond, II, initially saw the plaintiff at about 1:00 p.m. that day. Dr. Redmond found that the plaintiff had crepitus, indicating gas in the tissues of his left arm. Dr. Redmond planned to broaden the antibiotic coverage. When x-rays taken about 2:00 p.m. indicated "air" within the soft tissues of plaintiff's left arm, the plaintiff went to surgery at 4:10 p.m.
Dr. Redmond found that the skin, fat, and bulk of the muscles in the plaintiff's left arm were dead as the plaintiff had developed a compartment syndrome within the past few hours. After consulting with an orthopaedic surgeon, Dr. Redmond performed an open left shoulder disarticulation and amputated the plaintiff's left arm at the shoulder. Cultures showed that the dominant infectious organism in the plaintiff's left arm was a gas-forming organism, peptostreptococcus or peptostrep. The peptostrep organism is found in the human mouth and is a common infection with IV drug abusers. Plaintiffs left arm cultures revealed alpha and beta streptococcus. On June 28, 1988, the plaintiff was discharged from Charity.
On April 17, 1989, Louis Coleman, individually and as the father of Louis Frank Coleman, filed a request for a medical review panel pursuant to La. R.S. § 40:1299.41 et seq. under the private malpractice act. Coleman alleged that Dr. Ivan Sherman, Dr. Richard Deno, and JoEllen Smith Hospital were negligent and caused the loss of his left arm. Plaintiff claimed that the defendants failed to properly diagnose or treat his left arm abrasion on June 7 and 8, 1988 at the JoEllen Smith Emergency Room.
Plaintiff also filed a request for a medical malpractice panel pursuant to La. R.S. 40:1299.39 et seq. under the public malpractice act, naming Charity Hospital of New Orleans as a defendant. Plaintiff alleged that Charity was negligent in connection with the treatment of his left arm from June 9 to June 12, 1988.
On May 1, 1990, the medical malpractice panel concluded that there was no breach of the applicable medical standard of care by Dr. Sherman, Dr. Deno or JoEllen Smith Hospital and that "the conduct complained of was not a factor in the resultant damages."
On July 27, 1990, plaintiff filed a petition in civil district court against Dr. Sherman, Dr. Deno and JoEllen Smith Hospital because they failed to properly diagnose and treat plaintiff's left arm abrasion. The Louisiana Patients' Compensation Fund ("Compensation Fund" or "Fund") was an intervenor in the suit. On March 27, 1991, the plaintiff filed a supplemental petition claiming that the defendants violated CBRA's anti-dumping provision.[1] Plaintiff settled his claim against JoEllen Smith Hospital for $10,000, and the hospital was dismissed from the action on October 10, 1991.
Plaintiff settled his separately filed claim against Charity in March 1993 for $25,000, and Charity was dismissed from the action.
A jury trial was held on March 1-5, March 8-12 and March 15, 1999. On March 2, 1999, Dr. Deno filed peremptory exceptions of no cause of action and/or prescription on plaintiff's COBRA/EMTALA antidumping claim and a motion in limine for an order precluding any reference to *457 COBRA/EMTALA's anti-dumping provision, or race or socioeconomic status. The trial court granted Dr. Deno's exception of no cause of action.
In the March 15, 1999 jury verdict, the jury found that both Dr. Sherman and Dr. Deno were negligent, which contributed to the loss of plaintiff's left arm. The jury apportioned 20 % of fault to Dr. Sherman and 80 % to Dr. Deno. The jury found that Charity and plaintiff were not negligent. The jury awarded $4.4 million in general damages and $500,000 in special damages (lost wages, diminished earning capacity and the cost of replacing personal services). The jury found that the amount for future medical care and related benefits was $500,000. The damages sustained by plaintiff's son, Louis Frank Coleman, for loss of society and services was $1 million.

Original March 18, 1999 Judgment
The March 18, 1999 judgment was rendered in favor of the plaintiffs and against Dr. Ivan Sherman and Dr. Richard Deno, in solido. The judgment awarded $4,900,000 to the plaintiff, Louis Coleman, and $1,000,000 to Louis Coleman, as natural tutor of his minor son, Louis Frank Coleman. The awards were subject to the statutory limitation for each defendant in the sum of $100,000 for both plaintiffs plus interest. The judgment was with legal interest from the date of the claim filed with the Louisiana Patients' Compensation Fund Over-Sight Board. The trial court also provided for expert fees for seven doctors. The judgment noted that the jury found that Louis Coleman was in need of future medical care and related benefits in the amount of $500,000.00 (under La. RS. 40:1299.43).

Annotated March 18, 1999 Judgment
In the trial court's annotated judgment dated March 18, 1999, the award rendered against defendants, Dr. Ivan Sherman and Dr. Richard Deno, in solido, remained:

Louis Coleman, individually $4,900,000.00
Louis Coleman, as natural
 tutor of his minor son,
 Louis Frank Coleman $1,000,000.00

This annotated judgment award was subject to the statutory limitation for each defendant in the sum of $100,000 for both plaintiffs plus interest. La. R.S. 40:1299.42(B)(2). Further, judgment was rendered against the Patient's Compensation Fund in the sum of $300,000.00 for both plaintiffs.
Accordingly, the trial court found that Louis Coleman would recover judgment against each defendant doctor in the sum of $79,591.84 plus interest. The Patient' Compensation Fund owed the balance of $238,775.51 plus interest.
The trial court held that Louis Coleman on behalf of his minor son, Louis Frank Coleman, would recover from each defendant doctor the sum of $20,408.16 plus interest. The patient's Compensation Fund owed the balance of $61,224.49 plus interest.
The annotated judgment awarded legal interest from the date the claim was filed with the Patient's Compensation Fund Over-sight Board. The award for expert fees remained the same. The annotated judgment noted that Louis Coleman was in need of future medical care and related benefits in the amount of $500,000.00 under La. RS. 40:1299.43.

Final Amended June 1999 Judgment
After hearing post-trial motions the trial court rendered a final amended judgment dated June 24, 1999. The amended judgment provided the following:
The parties stipulated that Louis Coleman settled with Charity for $25,000 and settled with JoEllen Smith Hospital for $10,000. The trial court granted the defendant Dr. Ivan Sherman's motion for *458 judgment notwithstanding the verdict (JNOV). The trial court granted remittitur regarding the claim of Louis Coleman as natural tutor of his minor son, Louis Frank Coleman, to $10,000.00. The trial court noted that the jury found Louis Coleman in need of future medical care and related benefits in the amount of $500,000.00; however, the trial court did not enter a judgment on this sum.
The trial court denied the post-trial motions except as follows: The trial court reiterated that it granted Dr. Ivan Sherman's motion for JNOV, dismissing all claims against Dr. Sherman by Louis Coleman, individually and on behalf of his minor son, Louis Frank Coleman, with prejudice, each party to bear their own costs. Sole fault was assigned to Dr. Richard Deno.
In the amended judgment the trial court held that the award to Louis Coleman on behalf of his minor son, Louis Frank Coleman, is remitted from $1,000,000 to $10,000.
The trial court found that the award to Louis Coleman does not pre-empt the claim of the minor son. Louis Frank Coleman, and the awards should be pro rated.
The trial court ordered that the award to the minor son, Louis Frank Coleman, against Dr. Richard Deno was $1,018.30 and interest from April 1, 1991, with the Patient's Compensation Fund paying all other interest thereon. [$10,000.00 divided by $4,910,000,000 = .0020366%, which means that the minor son, Louis Frank Coleman's award on a total limitation of $500,000.00 is $1,018.30 ($500,000 ×.0020366 % = $1,018.00).]
The trial court decreed that the judgment in favor of plaintiff, Louis Coleman, against Dr. Richard Deno was $98,971.70 with interest from April 1, 1991, with the Patient's Compensation Fund paying all other interest.
The trial court ordered that the Louisiana Patients' Compensation Fund should receive credit of $100,000 for the judgment rendered against Dr. Richard Deno.
The trial court awarded $400,000 plus interest in favor of the plaintiff Louis Coleman against the Louisiana Patients' Compensation Fund.

Appeal
Plaintiff Louis Coleman, the defendant Dr. Richard Deno, and the intervenor, Louisiana Patients' Compensation Fund, appealed the trial court's judgment.
On appeal plaintiff Louis Coleman contends that: (1) the trial court erred in not allowing the plaintiff to disclose to the jury that Dr. Deno directed plaintiff to Charity because plaintiff lacked finances or hospitalization insurance; (2) Dr. Deno's fault in directing plaintiff to Charity because of the lack of finances or insurance is beyond the scope of the Louisiana Medical Malpractice Act, thereby removing the Act's limit on damages entitling the plaintiff to the full amount of the jury award; and (3) the trial court erred in granting a JNOV in favor of Dr. Sherman.
Defendant Dr. Richard Deno claims that: (1) the jury was prejudiced by plaintiff's witnesses' references to race and socio-economic status: (2) the jury charges were erroneous and confusing: (3) the verdict was contrary to the law and evidence; (4) the trial court erred in failing to apportion any fault to Charity; (5) the trial court verdict was manifestly erroneous because there was no credible evidence that the plaintiff was in need of future medical care; (6) the trial court abused its discretion in allowing testimony concerning the cost of a prosthesis device where there was no expert testimony establishing that the device was medically *459 necessary; (7) the jury verdict was manifestly erroneous because there was no evidence to support an award to the son, Louis Frank Coleman, for loss of consortium; and (8) the damage award to the minor son, Louis Frank Coleman, was extinguished by the award to his father, Louis I. Coleman.
Intervenor, The Louisiana Patients' Compensation Fund, argues that: (1) the trial court erred in denying Dr. Deno and the Fund's motions for new trial as well as JNOV, and the jury erred in finding that Dr. Deno was negligent; (2) there was no expert evidence to prove that Dr. Deno was negligent or caused or contributed to plaintiff's loss of his left arm; (3) the jury erred in failing to apportion fault to Charity; (4) the jury award was excessive; (5) the jury erred in awarding $500,000 in special damages for lost wages or diminished earning capacity; (6) the trial court and jury erred in rendering an award to the minor son, Louis Frank Coleman, for loss of consortium; (7) the trial court erred in permitting plaintiff's witnesses to testify regarding the cost of plaintiff's future medical care and including $500,000 for future medical care and related expenses in a lump sum; and (8) the trial court erred in failing to give the Patients' Compensation Fund a credit of $110,000 for plaintiff' pretrial settlements with JoEllen Smith and Charity Hospitals.

Plaintiff's Claims
Dr. Deno's Fault in Directing Plaintiffs Transfer to Charity for Lack of Finances or Insurance Creates a Timely Action Beyond the Scope of La. Medical Malpractice Act, Entitling Plaintiff to Full Amount of Jury Award
Plaintiff maintains that he asserted a cause of action, alleging that Dr. Deno improperly dumped an uninsured patient on another facility by directing Louis Coleman for treatment at Charity because he lacked the ability to pay JoEllen Smith Hospital. Plaintiff noted that the pertinent federal statute is 42 U.S.C. 1395dd, COBRA/EMTALA.
On the second day of trial the trial court granted Dr. Deno's combined exception of no cause of action and motion in limine, dismissing the EMTALA federal allegations and prohibiting the plaintiff from referring to his lack of insurance during the trial. The plaintiff does not object to the trial court's holding that the federal statutory law, EMTALA, afforded no cause of action against a defendant hospital. However, the plaintiff argues that the trial court erred in not allowing disclosure of the fact that plaintiff was transferred to Charity because he did not have sufficient funds or insurance to be treated at JoEllen Hospital.
The plaintiff contends that the trial court erroneously found that in his original petition, plaintiff did not give fair notice to the defendant of this claim. In his amended petition, plaintiff alleged a violation of COBRA, complaining that Dr. Deno negligently failed to treat the plaintiff because of the lack of insurance. Plaintiff contends that whether or not there was a formal cause of action under EMTALA, La. R.S. 40:2113.4 or Louisiana general tort law, fair notice of this being an issue in the case was given.
Plaintiff alleges that there was a CBRA/EMTALA violation in his amended petition on February 21, 1991, which was more than two years after the alleged June 8, 1988 violation of the EMTALA statute. Dr. Deno points out that the federal statute contains a two-year statute of limitations which is not interrupted by the provisions of the Medical Malpractice Act. Spradlin v. Acadia/St. Landry Medical Foundation, 98-1977 (La.2/29/00), 758 So.2d 116. The Louisiana Supreme Court *460 found that under provisions of the Medical Malpractice Act, including those limiting liability of qualified health care providers by providing a maximum amount of damages, a mandatory pre-suit review by a medical review panel, and special prescriptive and peremptive periods, apply only to "malpractice" as defined in the Act, and any other liability of the health care providers is governed by general tort law. Id., pp. 6-7, 758 So.2d at 120.
The federal anti-dumping statute does not provide a civil remedy against physicians. McDougal v. Blanch, 95-1377 (La.App. 1 Cir. 4/4/96), 672 So.2d 398, 400, fn. 3, writ denied, 96-1129 (La.6/7/96), 674 So.2d 973. La. R.S. 40:2113.4 also imposes upon hospitals the obligation to render emergency services to all persons regardless of insurance or economic status, but does not expressly impose or decline to impose the same obligation on physicians.
At issue is whether the plaintiff timely stated a cause of action in his pleadings under La.R.S. 40:2113.4 or Louisiana general tort law for patient dumping.
Pleadings must be construed reasonably so as to afford litigants their day in court, to arrive at the truth and to do substantial justice. Krebs v. Mull, 97-2643 (La.App. 1 Cir. 12/28/98), 727 So.2d 564, writ denied, 99-0262 (La.3/19/99) 740 So.2d 119. Under fact pleading, as opposed to theory pleading, the court is bound to construe allegations of fact under any theory of law that entitles the pleader to relief. National Gypsum Co. v. Ace Wholesale, Inc., 98-1196 (La.App. 5 Cir. 6/1/99), 738 So.2d 128. The function of the peremptory exception of no cause of action is to question whether the law extends a remedy to anyone on any grounds or portion of the demand. Kelly v. CNA Ins. Co., 98-0454 (La.3/12/99), 729 So.2d 1033; Schnell v. McKenzie's Tree Service, Inc., 98-1269 (La.App. 5 Cir. 3/30/99), 731 So.2d 922.
In the present case, in his original petition. Coleman alleged in pertinent part:
21.
Although he actually recognized, or should have recognized, the severe nature and seriousness of the plaintiff's arm infection. Dr. Deno nevertheless failed to hospitalize the plaintiff for immediate care and attention at JoEllen Smith Hospital, and instead instructed plaintiff to go to Charity Hospital, while at the same time giving him express permission to go first to his home to pick up certain belongings before going to Charity.
22.
The defendant Dr. Deno also telephoned Charity to assure that a hospital bed would be available for plaintiff, but failed to take steps in following up this telephone call to see to it that the plaintiff actually was admitted at Charity on his arrival there.
The plaintiff alleged that Dr. Deno transferred the plaintiff to Charity; however, the plaintiff did not state that it was because the plaintiff had no funds or insurance.
In his First Supplemental and Amended Petition for Damages, the plaintiff alleged:
22 A.
As a hospital receiving Medicare benefits for patient treatment, and/or as a physician employed by said hospital and/or treating such patients, the defendants JoEllen Smith Hospital and Dr. Richard Deno were obliged by federal law not to transfer Louis Coleman or direct him as a patient to Charity Hospital, without first being certain that his condition was stabilized and that no material *461 deterioration of his condition likely would result from the delay between his leaving JoEllen Smith Hospital and his arriving at Charity Hospital; and, accordingly, said defendants were negligent per se in regard to the above sequence of events, for having violated the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), added as a section to the Social Security Act, including, but not limited to, the provisions set forth in Section 1867 of the latter Act.
The plaintiff, Coleman, also added a new subparagraph to his petition as follows:
24.
e) The failure on the occasion of the second emergency room visit of June 8, 1988, to adhere to the "anti-dumping" provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), including, but not limited to the provisions set forth in § 1867 of the Social Security Act, for which violation the defendant and/or defendants would be liable on the basis of negligence per se.

The above language does not state a cause of action against Dr. Deno for patient dumping under the federal law because EMTALA only applies to hospitals and not physicians.
In Tabor v. Doctors Memorial Hosp., 563 So.2d 233 (La.1990), the physician who denied the patient admission to the hospital was below the standard of care required. The doctor did not feel that the patient presented an emergency or that the patient was suicidal. The Louisiana Supreme Court characterized the physician's actions in not waiving the $400 admission deposit and not admitting a suicidal patient as below the appropriate standard of care and referred to the Medical Malpractice Act. The Supreme Court concluded that the plaintiffs had met their burden of proving that the physician was liable under the medical malpractice action. The Supreme Court did not address the issue of whether Louisiana tort law provided a separate cause of action based on "patient dumping" because of lack of funds.
In Fleming v. HCA Health Services of Louisiana, Inc., 96-1968 (La.4/8/97), 691 So.2d 1216, 1219, after the patient was refused admittance to the hospital because he was unable to pay, he committed suicide. The Louisiana Supreme Court held that the evidence did not establish that the individual had need for emergency services at the time his wife requested such services from the hospital. The Supreme Court noted in footnote 3 that:
We also need not address the issues of whether a violation of La. Rev.Stat. 40:2113.6, which contains its own penalty provisions for a fine and suspension from the state medical assistance program, constitutes actionable fault in a tort action.
La. R.S. 40:2113.6(F) provides for monetary fines and/or suspension of employment of an officer, employee or member of the medical staff, but does not declare whether these individuals could also be liable for damages under the State patient dumping statute, or whether their individual responsibility is restricted to the penalty provisions.
In Spradlin v. AcadiaSt. Landry Med. Found., supra. fn 3, p. 3, 758 So.2d at 118, the Louisiana Supreme Court asserted that: "Only the first action solely against the hospital is before us." In footnote 8, p. 8, 758 So.2d at 121, the Supreme Court also stated that:
We do not address whether there is a cause of action for damages under La. Civ.Code art. 2315, the fountainhead of tort liability, based on the violation of a *462 statutory law designed to protect the injured person's interest.
The Supreme Court did not review the issue of whether a physician is liable for patient dumping under Louisiana tort law unrestricted by the Medical Malpractice Act. The Supreme Court noted that: "the Louisiana `anti-dumping' statute contains no express private cause of action." Id. at p. 5, 758 So.2d at 120.
In Bolden v. Dunaway, 97 1425 (La. App. 1 Cir. 12/28/98), 727 So.2d 597, writ denied 99-0275 (La.3/26/99), 739 So.2d 801, the appellate court reviewed a case in which the plaintiffs asserted in the amended petition that:
9.
As an additional cause of action. Dr. Dunaway's non-medical related decision to leave the hospital and not operate on his patient prepped for surgery because his fee was not in his pocket, was a non-medical related intentional act not based on rendering professional health care services as defined by LSA-R.S. 40:1299.41(8) and therefore not covered by the medical malpractice act. Id. p. 3, 727 So.2d at 599.
The patient needed surgery to remove a tumor. The patient and her husband brought an action against the surgeon for refusing to perform surgery because the patient had not made appropriate financial arrangements. The trial court granted the exception of prematurity to dismiss the husband and wife's negligence and breach of contract claims. The trial court allowed the plaintiffs' intentional tort claims to be maintained and allowed plaintiffs to proceed on the intentional infliction of emotional distress. The Third Circuit Court of Appeal reversed the trial court's judgment and found that the plaintiffs' claims were not malpractice as defined by La. R.S. 40:1299.41(8). The appellate court held that the alleged wrongdoing was the doctor's failure to assist with the surgery as he agreed to do, and the damages are based on the failure of the health care provider to render health care to a patient.
The appellate court characterized the doctor's alleged failure to render professional services of surgically assisting Mrs. Bolden, as he agreed to do, as a breach of contract, and upheld the cause of action subject to the requirements of the Medical Malpractice Act. The appellate court granted the exception of prematurity as to plaintiffs' malpractice claims. In that case the conduct of the doctor was characterized as a breach of contract. In the present case, Coleman had not consented to an operation, and Dr. Deno had not scheduled surgery, which created the basis for the contract in Bolden, supra.
The Louisiana Medical Malpractice Act must be strictly construed against limiting the tort claimant's rights against the wrongdoer. Johns v. Agrawal, 99-0500, 99-0499 (La.App. 4 Cir. 11/17/99), 748 So.2d 514, writ denied, XXXX-XXXX (La.2/11/00), 754 So.2d 944; Clark v. Baird, 97-1025 (La.App. 4 Cir. 5/20/98), 714 So.2d 840, writ denied 98-1684 (La.10/9/98), 726 So.2d 31. Were the health care provider to commit an intentional tort against a patient or negligently injure that patient in a manner unrelated to medical treatment, the Act's limitation of liability would not be available. Descant v. Administrators of Tulane Educational Fund, 93-3098 (La.7/5/94), 639 So.2d 246.
Intentional tort allegations constitute causes of action not governed by the Medical Malpractice Act. La. R.S. 40:1299.41 A(8); Richardson v. Advanced Cardiovascular Systems, Inc., 865 F.Supp. 1210 (E.D.La.1994). Whether the hospital *463 engaged in any intentional acts of conspiracy to cover up was fair grist for the medical review panel that had to consider the claim before a suit could be brought. Id. At the termination of the suspension of prescription during review by the medical review board, prescription commences to run again. Bordelon v. Kaplan, 96-1205 (La.App. 3 Cir. 3/5/97), 692 So.2d 581.
In the present case, in his amended petition, Coleman referred to a cause of action based on the negligent failure of the defendants to treat the plaintiff, as well as an intentional tort based on the federal anti-dumping provisions related to the transfer of a patient to another hospital for lack of funds. The Medical Malpractice Act only encompasses unintentional acts of negligence and contractual issues. JoEllen Smith Hospital's policy provided that every emergency room patient must receive appropriate treatment before discharge or transfer, regardless of financial status. The "patient dumping" cause of action refers to an intentional tort where Dr. Deno directed plaintiff's transfer to Charity for lack of finances or insurance although it conflicted with JoEllen Smith Hospital's written policy. We find no express state law that excludes recovery under La. C.C. art. 2315, general tort law, or La. R.S. 40:2113.4-40:2113.6 against physicians for the intentional tort of patient dumping. Plaintiffs reference to antidumping states a cause of action against the physician under Louisiana law.
Considering that the Medical Malpractice Act must be strictly construed against limiting the tort claimant's rights against the wrongdoer, Coleman's amended petition states a cause of action against the physician, Dr. Deno, beyond the scope of Louisiana Medical Malpractice Act, thereby entitling the plaintiff to the jury award that is not subject to the Act's $500,000 cap.

Prescription
With respect to review by a medical review panel, La. R.S. 40:1299.47 A(2)(a) provides:
The filing of a request for review shall suspend the running of prescription against all joint and solidary obligors and all joint tortfeasors, including but not limited to health care providers, both qualified and not qualified, to the same extent the prescription is suspended against the party or parties that are subject of the request for review.
See In re Robinson, 601 So.2d 385 (La. App. 4 Cir.1992).
Under Louisiana law Coleman need not assert his "patient dumping" action within the one-year tort prescription period while the action is pending before the medical review panel where Coleman alleged in the prayer of his original petition that: ... "plaintiff prays for judgment in his favor and against the defendants, jointly, severally and in solido...." Although this may conflict with EMTALA's two-year prescription period as found in Spradlin, supra,[2] in the present *464 case EMTALA does not apply. The liability of the physician Dr. Deno does not fall under the federal statute. State law applies. The suspension of prescription does not conflict with the State law where the medical review panel reviews all causes of action asserted in a case that includes medical malpractice claims, and the plaintiff alleged that the defendants were solidarily liable.
In general, any conduct by a health care provider complained of by a patient is properly within the scope of the Medical Malpractice Act if it can reasonably be said that it comes within the definition therein, even though there are alternative theories of liability. Bolden v. Dunaway, supra. When one or more alternative theories of liability is covered by the Medical Malpractice Act, courts generally apply the procedure set forth in the Act to all of the claims. Dominick v. Rehabilitation Hosp. of New Orleans, 97-2310 (La.App. 4 Cir. 4/15/98), 714 So.2d 739; DeBlanc v. Touro Infirmary, 96-1965 (La.App. 4 Cir. 12/27/96), 686 So.2d 1015. The filing of a medical malpractice claim with a medical review panel triggers the suspension of prescription specially provided by the Medical Malpractice Act rather than the interruption of liberative prescription generally provided in the Civil Code. LeBreton v. Rabito, 97-2221 (La.7/8/98), 714 So.2d 1226, overruling Hernandez v. Lafayette Bone & Joint Clinic, 467 So.2d 113 (La.App. 3 Cir.1985).
In the present case Coleman's injury occurred in June 1988. On April 17, 1989. Coleman filed a request for a medical review panel. On May 1, 1990 the medical review panel reached its ruling. Coleman filed his original petition in civil district court on July 27, 1990. Coleman alleged that the defendants were solidarily liable in his petition, and Coleman asserted a cause of action against the physician based on medical malpractice. The State patient dumping action has not prescribed as the institution of the dumping claim was suspended along with the medical malpractice claim, pending review of all claims by the medical review panel.

Motion for JNOV
Plaintiff asserts that the trial court erred in granting Dr. Sherman's motion for JNOV and dismissing Dr. Sherman from the action.
In a medical malpractice action against a health care provider, the patient must prove by a preponderance of the evidence that: (1) the doctor's treatment fell below the ordinary standard of care required of physicians in his medical specialty; and (2) that the doctor's substandard care caused the injury sustained. La. R.S. 9:2794; Byrd v. State, Through Depart. of Public Safety and Corrections, 93-2765 (La.5/23/94), 637 So.2d 114. A physician's duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Soteropulos v. Schmidt, 556 So.2d 276 (La.App. 4 Cir.1990). The law does not require absolute precision in medical diagnoses; acts of professional judgment are evaluated in terms of reasonableness under the circumstances then existing, not in terms of the result or in light of subsequent events. Id. Causation is a question of fact to which the trial court's determinations will not be disturbed absent manifest error. Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276 (La.1991). Before a fact-finder's verdict may be reversed, the reviewing court must find from the record that a reasonable factual basis *465 does not exist for the verdict, and the record establishes that the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314.
A motion for JNOV may be granted on the issue of liability or on the issue of damages or both issues. La. C.C.P. art. 1811(F); Ehrman v. Holiday Inns, Inc., 94-0312 (La.App. 4 Cir. 3/29/95), 653 So.2d 732, writs denied, 95-1051, 95-1058 (La.6/16/95), 655 So.2d 343. The trial court could only grant relief if, after reviewing the evidence in the light most favorable to the non-moving party, it determines that reasonable persons could not have reached the verdict that the jury reached. Bryant v. Solomon, 97-2008 (La. App. 4 Cir. 3/25/98), 712 So.2d 145. In ruling on a motion for JNOV, a court may not weigh the evidence or substitute its judgment for that of the jury. Id. If reasonable minds could not differ, then the trial court was correct in granting the motion. Anderson v. New Orleans Public Service, Inc. 583 So.2d 829, 832 (La.1991).
In reviewing the trial judge's decision to grant Dr. Sherman's motion for JNOV on the issue of Dr. Sherman's liability, we conclude that the motion was properly granted. In the present case the plaintiff did not complain to Dr. Sherman about his arm when Dr. Sherman saw him. The plaintiff's primary complaint was chest pain. The plaintiff's generalized symptoms did not develop into swelling in the area of plaintiff's arm until after the plaintiff's initial visit to the emergency room where Dr. Sherman examined him.
Dr. Paul Blaylock, plaintiff's expert in emergency and legal medicine, testified that plaintiff's arm still could have been saved when the plaintiff saw Dr. Deno during Coleman's second visit to the emergency room on June 8, 1988. Dr. Neil Crane, plaintiff's expert in internal medicine and infectious diseases, testified that Coleman's left arm was still salvageable on the evening of Wednesday, June 8, 1988, when he saw Dr. Deno for his second visit to the emergency room. Dr. Ronald Lee Nichols, the defendants' expert in general surgery with a subspecialty in surgical infectious diseases, also testified that Coleman's left arm was salvageable on June 8, 1988 and as late as June 9, 1988 at 8:00 a.m. when antibiotics were started at Charity Hospital. Dr. Clyde R. Redmond, II, an expert in cardiovascular and general surgery, testified that the 12-hour delay in treatment from 8:00 p.m. on June 8, 1988 to June 9, 1988 probably made no difference in the ultimate outcome. Dr. Joseph S. Litner, defendants' expert in emergency medicine, agreed that nothing occurred on June 7, 1988 that caused or contributed to the loss of Coleman's left arm. Dr. Norman E. McSwain, Jr., defendants' expert in general surgery, emergency medicine, policies and procedures and general trauma surgery, confirmed that nothing occurring on June 8, 1988 was related to the loss of the plaintiff's left arm, thus inferring that nothing occurring on June 7, 1988 was related to the loss of Coleman's arm. Dr. Michael K. Hill. defendants' expert in internal medicine and infectious diseases, testified that nothing done by Dr. Deno on June 8, 1988 caused the loss of the plaintiff's arm, thereby indicating that nothing done on June 7, 1988 caused the loss of the plaintiff's arm.
Dr. Sherman's treatment fell within the ordinary standard of care required of physicians in his medical specialty. Dr. Sherman's care was not substandard and did not cause the injury sustained. In reviewing the record as a whole, and resolving all reasonable inferences or factual questions in favor of the plaintiff, the evidence points so strongly in favor of Dr. Sherman that reasonable men could not find that his *466 actions or inactions on June 7, 1988 proximately caused the ultimate loss of the plaintiff's left arm. The trial court did not err in finding that, as a matter of law, no reasonable trier of fact could have found as the jury did, and the trial court properly granted Dr. Sherman's motion for JNOV.

Dr. Deno's Appeal

Mistrial
Dr. Deno contends that the trial court erred in failing to grant a mistrial. Dr. Deno's claims for mistrial were based on the fact that plaintiff and his counsel continued to make references to the plaintiff's race and social-economic status. Dr. Deno argues that a mistrial should have been granted because the plaintiff continued to violate the trial court's ruling that the plaintiff could not proceed against the physicians on a cause of action for patient dumping or refer to the plaintiff's lack of hospitalization insurance.
In this appellate review, this Court has determined that the plaintiff stated an anti-dumping cause of action against physicians under Louisiana law. Although the trial court ordered that no reference should be made to the plaintiff's lack of insurance, the references to anti-dumping were properly before the jury. Furthermore, the trial court has great discretion to determine motions for mistrial. Searle v. Travelers Ins. Co., 557 So.2d 321 (La.App. 4 Cir.1990). Mistrials are granted only upon proof that there has been such prejudice to a party during trial that it cannot be cured by admonition or instruction to the jury. Barnes v. Thames, 578 So.2d 1155 (La.App. 1 Cir.1991). Before declaring a mistrial, the trial court must determine that: (1) it is impossible to reach a proper judgment because of some error or irregularity, and (2) that there is no other remedy to provide relief to the moving party. Searle, supra.
In the present case, during the voir dire. Dr. Deno's counsel acquired a collective affirmation from the jurors that any decision would be free from bias, prejudice, passion and sympathy. References, including those to the plaintiff's life in the housing project and the fact that the police stopped the plaintiff because they thought he had a gun when he couldn't remove his artificial arm from his pocket, were not so prejudicial as to make it impossible to reach a proper judgment or create a situation where nothing could provide relief by any other remedy. Under the totality of circumstances, the trial court cannot be found to have abused its discretion in denying Dr. Deno's motion to grant a mistrial.

Jury Instructions
Dr. Deno complains that the jury charges were erroneous and confusing, and that this court is therefore required to conduct a de novo review of the record.
The trial judge is not required to give the precise instructions submitted by the parties, but rather must give instructions which must properly reflect the law applicable in light of the facts of the particular case. Sparacello v. Andrews, 501 So.2d 269, 277 (La.App. 1 Cir.1986). Jury charges will be considered adequate on appeal if they fairly and reasonably identify the issues and provide correct principles of law. Johnson v. Terrebonne Parish Sheriff's Office, 95 1180 (La.App. 1 Cir. 2/23/96), 669 So.2d 577, 582, writ denied 96-0727 (La.4/26/96), 672 So.2d 907. Instructions which omit an applicable, essential legal principal constitute reversible error. Sons v. Delaune, 634 So.2d 1212, 1216 (La.App. 1 Cir.1993), writ denied, 94-0729 (La.5/6/94), 637 So.2d 1050. The question is whether the jury was misled to such an extent that it was not able to do justice. Girvan v. New Orleans Public Service, *467 Inc., 94-0681 (La.App. 4 Cir. 11/30/94), 646 So.2d 481, writ denied 94-3169 (La.3/10/95), 650 So.2d 1178. The trial court must instruct the jury as to the law and avoid confusing the jury. Kennedy v. St. Charles General Hospital Auxiliary, 630 So.2d 888 (La.App. 4 Cir.1993), writ denied, 94-0269 (La.3/18/94), 634 So.2d 863.
Discovery of an error in a jury instruction, by itself, does not justify a trial de novo by an appellate court without measuring the gravity and degree of the error, and considering the instructions as a whole, as well as the circumstances of the case. Barnett v. New Orleans Public Service, Inc., 489 So.2d 452 (La.App. 4 Cir. 1986). When a jury was erroneously instructed and the error probably contributed to the verdict, a reviewing court must set aside the jury verdict. Kibble v. B.P.O. Elks Lodge No. 30, 640 So.2d 267 (La.App. 4 Cir.1993), writ denied, 94-0922 (La.5/20/94), 641 So.2d 204; Boh Brothers Const. Co., Inc. v. Luber-Finer, Inc., 612 So.2d 270 (La.App. 4 Cir.1992), writ denied, 614 So.2d 1256 (La.1993). Only then should a reviewing court make an independent de novo determination of the facts from the record, if possible, without according any weight to the factual findings of the erroneously instructed jury. The manifest error standard is not utilized when a jury's findings are tainted. Picou v. Ferrara, 483 So.2d 915 (La.1986).
Dr. Deno asserts that references to the plaintiff's socio-economic status resulted in prejudice and sympathy. Dr. Deno avers that the trial court's failure to give a jury charge that the verdict should not be based on sympathy, but solely on the evidence was reversible error that tainted the verdict and mandates a de novo review. The record shows that the trial court gave the instruction: "You must not allow any sympathy you may naturally feel for anyone to influence your judgment."
Dr. Deno also avers that the trial court failed to charge the jury on the issue of proximate cause. Dr. Deno complains that the trial court failed to give the following jury charge: "If in a sequence of events between the original negligence and the injury, an entirely independent cause intervenes, which is of itself sufficient to stand as the cause of the accident, the second cause is the proximate cause of the incident, and the original negligence is not the proximate and intervening cause." See Fabre v. B.F. Goodrich Co., 218 So.2d 617, 620 (La.App. 4 Cir. 1969). Dr. Deno asserts that the testimony of the plaintiff and defendants' experts was that Charity Hospital was at fault and was the cause of the loss of the plaintiff's arm. Dr. Deno maintains that the jury should have been charged on the issue of proximate cause and intervening cause.
The trial judge instructed the jury that it was the plaintiff's burden to prove that the defendant physicians' fault proximately caused the plaintiff's harm, i.e., that because of their fault Mr. Coleman suffered injuries that would not otherwise have occurred. The trial judge also told the jury that neither defendant, Dr. Sherman or Dr. Deno, can be liable for malpractice occurring at Charity Hospital, if any. The Court instructed the jury that factors may act independently or together to cause harm. The trial court further stated that one of the factors to be weighed in allocating fault among the physicians and Charity was the extent to which their substandard conduct caused or contributed to the plaintiff's injury.
Dr. Deno contends that the trial court failed to charge the jury on the burden of proof for a malpractice case as articulated under La. R.S. 9:2794(A). The record shows that the trial court used the wording *468 of La. R.S. 9:2794(A) regarding the burden of proof.
Dr. Deno asserts that the trial court erred in failing to charge the jury that the verdict should not be based upon speculation, as well as that a physician is not a guarantor of the results and that there is a presumption of reasonable care. The record shows that the trial court instructed the jury to base its decision only on the evidence that the jury heard and saw during the trial. The trial court also informed the jury that the plaintiff's injury does not raise a presumption that either Dr. Deno or Dr. Sherman breached the standard of care and that a physician is not a guarantor of good results.
Dr. Deno argues that the trial court failed to charge the jury that in a medical malpractice case, the jurors must be guided by the views and opinions of experts in the same medical specialty. Where the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only those qualified in that specialty may offer evidence of the applicable standards. La. R.S. 9:2794(A)(1); Steinbach v. Barfield, 428 So.2d 915 (La. App. 1 Cir.), writ denied, 435 So.2d 431 (La.1983). However, it is a specialist's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised; a particular specialist's knowledge of the subject matter on which he is to offer expert testimony is determined on a case by case basis. McLean v. Hunter, 495 So.2d 1298 (La.1986). It is well established that where medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines. The opinions of a specialist as to matters within his field are entitled to greater weight than an opinion on the same subject by a specialist in another field. Faust v. Lombardo, 463 So.2d 745 (La.App. 4 Cir.), writ denied 464 So.2d 1380 (La.1985). The weight to be given to a medical expert's testimony ultimately rests with the finder of fact. Herpin v. Witherspoon, 95-370 (La.App. 3 Cir.1995), 664 So.2d 515.
The jury instructions in the present case were adequate as they fairly and reasonably identified the issues. Considering the jury charges as a whole and the circumstances of the case, the jury instructions reflect the applicable law in light of the pleadings and facts of the case. The jury was not misled to such an extent that it was not able to do justice. The jury charges do not justify a de novo review by this court.

Jury Verdict
Dr. Deno contends that the verdict was contrary to the law and evidence because plaintiff's experts failed to address how his receiving one dose of antibiotics at JoEllen Smith Hospital would have affected his outcome. Dr. Deno asserts that the plaintiff provided no credible evidence that Dr. Deno breached the applicable medical standard of care.
La. R.S. 9:2794(A) mandates that plaintiff in a medical malpractice action prove:
(1) The degree of knowledge and skill possessed or the degree of care ordinarily exercised by physicians.... and where the defendant practices in a particular specialty ... plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked the degree of knowledge or skill or failed to use reasonable care and diligence, *469 along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred.
As noted previously with respect to the lack of liability of Dr. Sherman, a physician's duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Soteropulos, supra. The law does not require absolute precision in medical diagnoses. Id. Acts of professional judgment are evaluated in terms of reasonableness under the circumstances then existing, not in terms of the result or in light of subsequent events. Id.
Dr. Deno refers to the testimony of Dr. Ronald Lee Nichols (defendant's expert in general surgery with a subspecialty in surgical infections diseases), Dr. Norman E. McSwain, Jr., (defendant's expert in general surgery, emergency medicine, policies and procedures, as well as general trauma surgery), and Dr. Michael K. Hill (defendant's expert in internal medicine and infectious diseases). These doctors testified that the plaintiff was stable and an appropriate candidate to transport himself to Charity. They confirmed that the plaintiff lost his arm due to the development of a compartment syndrome. The doctors testified that the plaintiff's condition did not rapidly and progressively deteriorate in the 2 ½ hours from the time he left JoEllen Smith Hospital to the time that he arrived at Charity. Plaintiff was not septic when he arrived at Charity, and blood cultures initially done at Charity revealed that the plaintiff had no indication of any ongoing sepsis or bacteria in his blood. The physicians also agreed that if antibiotics were begun at JoEllen Smith Hospital, the drugs would have destroyed or tainted the blood cultures done at Charity.
Dr. Deno asserts that the plaintiff's experts did not review the Charity record regarding the cause of the plaintiff's amputation, i.e., compartment syndrome, and therefore their testimony was not credible. Dr. Deno avers that the plaintiff's arm was destroyed by the development of compartment syndrome, and the failure of Dr. Deno to administer antibiotics was irrelevant. Dr. Deno points out that the plaintiff's expert in internal medicine and infectious diseases, Dr. Neil Crane, provided inconsistent testimony and should be discredited. Dr. Deno states that during his deposition, Dr. Crane did not have an opinion as to when the plaintiff's arm became unsalvageable; however, during trial, Dr. Crane opined that the plaintiff's arm was not salvageable as of June 9, 1988. Dr. Deno contends that Dr. Crane's testimony is inconsistent and therefore cannot be credible on this point.
The plaintiff argues that Dr. Crane testified that the earlier the treatment, the better the chance of achieving a good result. When Dr. Deno saw the plaintiff on June 8, 1988. Dr. Crane characterized the situation as limb threatening and life threatening, requiring immediate emergency treatment in the form of a culture of the fluid at the infection site, i.e., antibiotic treatment, and a surgical consult. Dr. Crane opined the plaintiff could be transferred to Charity by ambulance after a culture was obtained and antibiotic treatment commenced.
Dr. Paul Blaylock, plaintiff's expert in emergency and legal medicine, testified that the plaintiff would not have lost his arm by surgery on June 11, 1988, had he received proper treatment while under the care of Dr. Deno on June 8, 1988. Dr. Blaylock also stated that the plaintiff's arm *470 was still salvageable when the plaintiff saw Dr. Deno on June 8, 1988.
The claimant in a malpractice action need not show that he would have obtained a perfect outcome in the absence of the malpractice; rather, he may recover on a showing that the health care provider's negligence denied him a chance of a good outcome. Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099, p. 3 (La.7/5/94), 639 So.2d 216, 219; Graham v. Willis-Knighton Medical Center, 27,338 (La.App. 2 Cir. 9/29/95), 662 So.2d 161, 164. The reviewing court must give great weight to factual conclusions of the trier-of-fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are reasonable. Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Evidence was presented upon which the jury could conclude that Dr. Deno performed below the standard of care within his medical specialty in failing to provide immediate antibiotic treatment to the plaintiff on September 8, 2000. We cannot find that the jury was clearly wrong in concluding that Dr. Deno breached his standard of care.

Charity's Fault
Dr. Deno contends that the trial court was manifestly erroneous in not apportioning any fault to Charity Hospital for the loss of the plaintiff's arm. Dr. Deno notes that the medical experts testified that the plaintiff should have been seen within 30 minutes after he went to Charity. Dr. Deno states that the medical experts criticized Charity's delay in antibiotic treatment and lack of a surgical consult.
Dr. Clyde Redmond was the surgeon who stated that he performed the amputation of the plaintiff's arm. Drs. Hill and McSwaim supported the diagnosis of Dr. Redmond that the plaintiff lost his arm due to a compartment syndrome and that Charity's failure to consult a general surgeon on June 10, 1988 cost the plaintiff a chance of saving his arm.
The plaintiff argues that Dr. Redmond's video deposition testimony was inconsistent with Dr. Redmond's trial testimony because Dr. Redmond did not mention the compartment syndrome during the video deposition. The plaintiff maintains that Dr. Redmond's testimony should be disregarded.
Dr. Redmond claimed that he had not seen part of the plaintiff's Charity record when he testified in the video deposition. At trial Dr. Redmond told the jury that the plaintiff experienced compartment syndrome secondary to infection. Dr. Redmond stated that nothing Dr. Deno failed to do in this case could possibly have mattered, and the attending doctor at Charity on June 10, 1988 deviated from the standard of care by not consulting with him as a surgeon sooner so that Dr. Redmond could have saved the plaintiff's arm by operating on June 10, 1988. The plaintiff urges that it was not surprising that the jury chose to discredit and disbelieve Dr. Redmond's trial testimony. The plaintiff points out that the Charity records were available since 1988. Plaintiff asserts that the jury could have rejected this testimony and found that if Dr. Deno had treated the plaintiff with antibiotics, his arm could have been salvaged. Therefore, Charity was not at fault.
*471 We cannot find that the jury was clearly wrong in concluding that Charity did not breach its standard of care where the jury could have concluded that the plaintiff's arm could have been saved if Dr. Deno had treated him with antibiotics on June 8, 1988.

Future Medical Care
Dr. Deno submits that the trial court's verdict was manifestly erroneous because the plaintiff provided no credible evidence that the plaintiff is in need of future medical care, and the trial court erred in allowing plaintiff's expert to testify about the cost of future medical costs.
La. R.S. 40:1299.43(A)(1) provides in pertinent part:
In all medical malpractice claims filed with the Board which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof.
In Hollingsworth v. Bowers, 96-257 (La. App. 3 Cir. 12/30/96), 690 So.2d 825, the child suffered nerve injury, which caused the loss of use of his arm as a result of the negligence of a physician and nurses during delivery. The appellate court found that an award of damages for all future medical benefits as they accrued to, rather than an award of a specific amount for future medical care and expenses, was proper where the child was a patient whose recovery consumed the entire amount recoverable under the damage cap.
The trial court is required to include in the judgment a finding that the patient was in need of future medical care and related benefits, thus triggering the applicability of the statute providing that medical malpractice victims may be awarded future medical care and benefits from the Louisiana Patients Compensation Fund. Bijou v. Alton Ochsner Medical Foundation, 95-3074 (La.9/5/96), 679 So.2d 893; Accardo v. Cenac, 97 2320 (La. App. 1 Cir. 11/6/98), 722 So.2d 302. The statutory provisions of the Medical Malpractice Act vest exclusive jurisdiction of decision making and supervision over medical and related care claims with the Patient's Compensation Oversight Board, the agency legislatively assigned to administer the Fund. Bijou, supra.
Dr. Deno declares that the plaintiff did not provide any evidence of any medical expenses incurred by the plaintiff since he lost his arm. The plaintiff was not satisfied with the prosthesis he had the second time he went to see Dr. James Butler, a Board certified orthopedist. Dr. Deno asserts that there was no evidence as to the origin of this prosthesis or any expenses incurred in obtaining it. Dr. Butler testified that there was no medical reason that required the plaintiff to have a prosthesis. Although Dr. Butler wrote plaintiff a prescription for a prosthesis, he never saw the plaintiff with a prosthesis. Dr. Butler did not order a myo-electric prosthesis.
Dr. Deno contends that the trial court abused its discretion in allowing Michael Lambert, the plaintiff's expert, to testify as to the cost of a prosthetic device where there was no medical testimony that the plaintiff needed it. Dr. Deno contests that it is highly speculative as to whether the plaintiff was a candidate for a myo-electric arm as he has never been evaluated for that type of prosthesis.
Dr. Deno objects to the testimony of Michael Lambert, the owner of Lambert's Orthotics and Prosthesis, and certified by the American Board of Certification for Orthotics and Prosthetics, without medical testimony that the prosthesis was necessary. Considering that Mr. Lambert owned the company that supplied prosthetic devices, Mr. Lambert properly testified about the cost of those prosthetic devices. *472 Mr. Lambert prepared a lifetime estimate for the plaintiff's shoulder disarticulation prosthesis, a myo-electric type that would be functional as well as cosmetic. Mr. Lambert's total estimate was over $900,000 for the plaintiff's prosthetic needs.
Dr. Deno also complains that Bob Roberts, an expert in vocational evaluation, was not qualified to testify regarding the plaintiff's medical need of a myo-electric arm or the psychological effect the loss of an arm would have on the plaintiff, considering Roberts' lack of training as a psychologist.
Bob Roberts, an expert in vocational evaluation, properly testified as to the plaintiffs potential for employment. He testified that the plaintiff will require training for the use of a functional prosthetic arm. Mr. Roberts did not think that the plaintiff would progress to the point of being competitive for gainful employment. Dr. Richard Richoux, plaintiff's treating psychiatrist, testified that the plaintiff will require future medical treatment because of a major chronic depression related to the loss of his arm. Future treatment would include monthly psychotherapy and continued medication for depression and anxiety.
The plaintiff asserts that Dr. James Butler testified that a prosthesis was reasonable and appropriate, assuming the plaintiff desired it. Dr. Butler also testified that the plaintiff would need future medical care with doctor visits to monitor the prosthesis and replace it when it wore out or problems arose.
La. R.S. 40:1299.43(B)(1) provides:
"Future medical care and related benefits"... are all reasonable medical, surgical, hospitalization, physical rehabilitation and custodian services and include drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services after the date of injury.
La. R.S. 40:1299.43(D) states:
Payments for medical care and related benefits shall be paid by the patient's compensation fund without regard to the five hundred thousand dollar limitation imposed in R.S. 40:1299.42.
Considering that Mr. Lambert projected that treatment with the myo-electric prosthesis would be $900,000, we cannot find that the jury erred in finding that the future medical expenses would be $500,000. The jury must have calculated this amount not on the cost of treatment with a myo-electric prosthesis but with medical treatment based on a less expensive prosthesis. We cannot say that the jury was clearly wrong in determining that the plaintiff's future medical expenses would be $500,000 over a thirty-year period.
Dr. Deno and the Patient's Compensation Fund argue that the future medical care and related benefits should be paid as incurred from the time of trial.
La. R.S. 40:1299.43(A)(1) provides in pertinent part:
(1) in all malpractice claims filed with the board which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof.
La. R.S. 40:1299.433(A)(2) states that in a medical malpractice claim tried by the court, the trial court's finding shall include a recitation that the patient is or is not in need of future medical care and the amount thereof. These sections indicate that the issues of whether a patient is in need of future medical care and related benefits and the amount thereof are fact questions for the jury or judge. Descant *473 v. The Administrators of the Tulane Educational Fund, 95-0751 (La.App. 4 Cir. 4/5/95), 653 So.2d 819.
The district courts are not vested with original jurisdiction or decision-making responsibility over future medical care claims. Kelty v. Brumfield, 93-1142 (La.2/25/94), 633 So.2d 1210. La. R.S. 40:1299.43(C) vests exclusive jurisdiction of the initial disposition of the claim in the Patient's Compensation Fund and Oversight Board, a state agency with exclusive authority to pay, reject, settle, and monitor all claims and to administer the fund from which all claims are paid. Id.
In Bijou v. Alton Ochsner Medical Foundation, 95-3074, p. 6 (La.9/5/96); 679 So.2d 893, 898, the Louisiana Supreme Court stated:
Thus, after obtaining a favorable court judgment on the issue of future medical care and related benefits, the plaintiff may file a claim with the Board. In the case at hand, the trial court found Mr. Bijou to be in need of future medical care and benefits, and rendered a judgment to this effect. Following Kelty v. Brumfield and La. R.S. 40:1299.43(C), Mr. Bijou should make a claim to the Patient's Compensation Fund Oversight Board for further action and recovery of his future medical care and related benefits claim....
In the present case the trial court's judgment shows that the plaintiff, Louis Coleman, is in need of future care and benefits. Coleman should make his claim to the Patient's Compensation Fund Oversight Board for further action and recovery of his future medical care and related benefits claim. The Board has exclusive authority to pay, reject, settle, and monitor all claims and to administer the fund from which all claims are paid.
In its final amended June 1999 judgment the trial court properly found that the jury determined that the plaintiff, Louis Coleman, was in need of future medical care and related benefits in the amount of $500,000 without entering a judgment on this sum.

Loss of Consortium
Dr. Deno contends that the trial court erred in awarding loss of consortium to the son, Louis Frank Coleman. Loss of consortium includes such elements as loss of service, loss of love and affection, loss of society and companionship, loss of sexual relationship, loss of support and loss of felicity or overall contentment and happiness. Vaccaro v. Sports and Imports, Inc., 539 So.2d 989 (La.App. 4 Cir. 1989), writs denied, 541 So.2d 1391, 1392 (La.1989). Dr. Deno asserts that there was no credible testimony with regard to an established relationship between the plaintiff and his son. The plaintiff points out that at the time of the plaintiff's amputation, Ms. Bradley, the mother of his child, was nine months pregnant with plaintiff's son. The plaintiff was present at his son's birth. Ms. Bradley affirmed that plaintiff's amputation has damaged the father/son relationship. The plaintiff notes that the plaintiff and his son would not be able to play football or basketball together, and the loss of plaintiffs arm precluded activities ranging from hugs to wrestling. Ms. Bradley stated that the child was afraid of his father because the father only had one arm.
The trial court reduced the jury verdict from $1,000,000 to $10,000 for the son's loss of consortium. There was support in the record for the $10,000 award to the son, Louis Frank Coleman, for loss of consortium.
Dr. Deno claims that the judgment should be amended to reflect that the *474 loss of consortium claim of the son, Louis Frank Coleman, was extinguished by the quantum awarded Louis I. Coleman. The loss of consortium claim on the part of the son, Louis Frank Coleman, is a claim that is derivative of the claim of his father. Dr. Deno refers to Hollingsworth v. Bowers, 96-257 (La.App. 3 Cir. 12/30/96) 690 So.2d 825, 832, which held that because the damages awarded a child injured during child birth exceeded the medical malpractice cap, the mother's derivative claim for loss of consortium was extinguished and the judgment was amended to reflect its extinguishment. In Armand v. State, Dept. of Health and Human Resources, 97 2958 (La.App. 1 Cir. 2/23/99), 729 So.2d 1085, 1094-1095, writ denied, 99-0842 (La.5/14/99), 741 So.2d 661, the appellate court noted that La. R.S. 40:1299.42 provides a $500,000 cap on damages. The cap includes any derivative claims that arise from the same act of malpractice.
In the present case, the intentional tort claim based on patient dumping by the physician is not subject to the cap under the Medical Malpractice Act. The loss of consortium claim of the son, Louis Frank Coleman, was not extinguished by the quantum awarded Louis I. Coleman. The plaintiff did not contest the trial court's reduction of the jury verdict from $1,000,000 to $10,000 for the son's loss of consortium. Accordingly, The trial court's final June 1999 judgment is amended in part to reflect an award of $10,000 to the son, Louis I. Coleman, for loss of consortium against the defendant Dr. Deno. This award is not allocated to the Louisiana Patients' Compensation Fund because as noted above, the Fund would not be responsible for a derivative claim.

Louisiana Patients' Compensation Fund's Appeal
The following claims by the Fund have been reviewed previously: (1) the trial court erred in denying Dr. Deno and the Fund's motion for new trial and JNOV; (2) the trial court erred in finding Dr. Deno negligent; (3) the trial court erred in failing to proportion fault to Charity; (4) the trial court erred in rendering an award to the son, Louis Frank Coleman, for loss of consortium; and (5) the trial court erred in rendering an award of $500,000 for future medical care and related expenses in a lump sum.
The Fund presents the following additional claims: the jury award was excessive; the trial court erred in awarding $500,000 in special damages for loss of wages or diminished earning capacity; and the trial court erred in failing to give the Fund a credit of $110,000 for plaintiff's pretrial settlements with JoEllen Smith and Charity Hospitals.

Excessive Jury Award
The Fund argues that the jury award is grossly excessive and is not supported by the record. The Fund requests that this Court grant a new trial on the issue of damages or reduce plaintiff's general damages. The jury awarded $4,400,000 in general damages to the plaintiff, plus $500,000 for loss of wages, as well as diminished earning capacity. The jury noted the amount of $500,000 for future medical expenses.
Consideration of the jury's determination of damages is limited to a review for abuse of discretion on appeal. The discretion vested in the trier of fact is "great," and even vast, in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), certiorari denied, sub nom. Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). When damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. La. *475 C.C. art.1999; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination of an abuse of discretion is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point that is reasonably within that discretion. Youn, supra.

General Damages
General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors that affect the victim's life. Delphen v. Department of Transp. and Development, (La.App. 4 Cir. 5/24/95), 657 So.2d 328, writ denied, 95-2116 (La.11/17/95), 663 So.2d 716, and writ denied, 95-2124 (La.11/17/95), 663 So.2d 717. The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific. The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991).
In the present case the trial court reviewed the general damage award with respect to the Medical Malpractice Act. The trial court did not review the jury's damage award with respect to the cause of action that is not restricted to the Act's cap. The plaintiff did not willingly give up his arm. His arm will never be reattached because it does not exist. It is very difficult to value what an arm is worth. Some individuals would not give up an arm for any amount of money. Some individuals would give up an arm for less and some for more. But who is to determine that? That is the purpose of the jury.
Based on Youn, this Court does not find that the jury, as trier of fact, abused its vast discretion in its general damage award.

Special Damages for Loss of Wages or Diminished Earning Capacity
The Patient Compensation Fund argues that the special damage award of $500,000 for loss of wages and diminished earning capacity is excessive and not proved by the evidence. The Fund maintains that Coleman did not have a boxing career, and his last "win" as a boxer was in May 1987, more than one year before the alleged malpractice. Plaintiff's counsel hired the defendant as a court runner after Coleman's arm was amputated.
Nancy T. Favaloro, Dr. Deno's vocational rehabilitation expert, testified that the plaintiff had no learning disability, was of average intelligence, and capable of obtaining his GED. The Fund asserts that the plaintiff was not borderline mentally retarded and has no psychiatric work restrictions. Ms. Favaloro found that training programs were available and the plaintiff could find employment positions such as substance abuse counsel or x-ray technician, which paid $9 to $10 hourly. Other jobs, paying up to $6.00 hourly, were available such as parking lot attendant, court runner and light janitorial work.
The plaintiff contends that the plaintiff's boxing days are over, that the plaintiff has limited education and little prospect of earning a decent living in the future. The plaintiff asserts that Mr. Coleman was earning $60 a day for Bundy Seafood at the time of his June 1988 injury. He had worked in heavy labor his entire life. The plaintiffs vocational expert Bob Roberts testified that the plaintiff is not likely to *476 ever be competitive in the job market again. Plaintiff's expert economist, Dr. Melville Wolfson, testified that the plaintiffs total economic loss is between approximately $340,000 and $480,000. Dr. Richard Richoux, a psychiatrist, saw the plaintiff fifteen times in five and one-half years. His diagnosis of plaintiffs condition included major depression and anxiety, directly related to the loss of his arm.
Based on the plaintiff's difficulty in doing tasks that he could previously do, and considering his great mental depression that would interfere with his work, we cannot say that the trial court abused its discretion in awarding $500,000 in special damages for loss of wages and diminished earning capacity.

$110,000 Credit for Pretrial Settlements
The Patient's Compensation Fund contends that: (1) the Fund did not receive written notice of the settlements with Charity and JoEllen Smith Hospital; and (2) the Fund is entitled to credit of $110,000 for the plaintiffs pretrial settlements with JoEllen Smith Hospital and Charity Hospital for $10,000 and $25,000 respectively. The plaintiff argues that the defendants cannot receive credit for these settlements where no liability is established. The plaintiff avers that the present case is not one where the plaintiff settled with all health care providers and therefore the plaintiff was not obliged statutorily to then notify the Fund of these settlements and then continue the trial against the Fund itself. The plaintiff asserts that he proceeded to trial against the remaining two providers, and the Fund was not implicated by the settlements.
Under the provisions of the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41 et seq., the total amount recoverable by a plaintiff alleging damages caused by medical malpractice is limited to $500,000 plus interest and costs. La.R.S. 40:1299.42(B)(1). Giammanchere v. Ernst, 96-2458 (La.App. 4 Cir. 5/19/99), 742 So.2d 572, 578, writs denied, 99-2924 & 99-2928 (La.12/14/99), 751 So.2d 881-882. Of that amount, a qualified health care provider may be liable for $100,000 plus interest. La. R.S. 40:1299.42(B)(2). Id. Any amount due up to the cap from a judgment or settlement in excess of the total liability of the qualified health care providers must be paid by the Fund. La. R.S. 40:1299.42(B)(3)(a). Id.

Notice
The Fund claims that it did not receive written notice of the settlements with Charity and JoEllen Smith Hospital in the present case. However, the Fund did not file an exception of no cause of action based on the plaintiff's failure to notify the Fund. La. C.C.C. art. 927(B) provides:
B. The court cannot supply the objections of prescription and res judicata, which must be specially pleaded. The nonjoinder of a party, or the failure to disclose a cause of action or a right or interest in the plaintiff to institute the suit, may be noticed by either the trial or appellate court of its own motion.
This Court recognizes, sua sponte, and reviews the Fund's assertion of no written notice as an exception of no cause of action based on the claim that the plaintiff lost the right to proceed against the Fund for recovery when the plaintiff failed to properly notify the Fund of the settlements.
In Horil v. Scheinhorn, 95-0967 (La.11/27/95), 663 So.2d 697, the plaintiff settled his case against the qualified health care provider for $100,000 and subsequently sought additional damages from the Fund. The Louisiana Supreme Court found that a claimant expecting excess recovery from the Fund must closely follow La. R.S. 40:1299.44(C) when requesting *477 court approval of a settlement. Id., 663 So.2d at 698.
In Castille v. Our Lady of Lourdes Regional Medical Center, 96-1476, p. 3 (La. app. 3 Cir. 4/2/97), 692 So.2d 1303, 1305, the Third Circuit interpreted Horil v. Scheinhorn, supra. to require compliance with the provisions of La. R.S. 40:1299.44(C) anytime a plaintiff attempts to obtain excess damages from the Fund. In Castille the plaintiff settled his claim with the qualified medical provider for $75,000. The settlement was approved by the court and contained a reservation of rights against the Fund. The plaintiffs also amended their original petition to name the Fund as a defendant; however, the requirements of La. R.S. 40:1299.44(C) were not met.
In Giammanchere v. Ernst, id., the plaintiffs filed suit against Touro, Dr. Mandich and Dr. Ernst. Prior to trial, the plaintiffs settled their suit against Dr. Mandich for $31,500. The plaintiffs proceeded to trial against another medical provider, Dr. Ernst, as well as Touro. After trial, the jury found that Dr. Mandich was 60% at fault, Touro was 10% at fault, and Ms. Giammanchere was 30% at fault. The jury awarded $800,000 in favor of the plaintiffs, which was reduced to the $500,000 liability limit under the Medical Malpractice Act. The Fund then intervened and appealed the judgment. The Fund filed an exception of no cause of action. On rehearing, this Court reviewed the Fund's exception of no cause of action based on the contention that the plaintiffs lost their right to proceed against the Fund for recovery when they failed to follow the requirements of La. R.S. 40:1299.44(C). The Fund claimed that the plaintiff failed to file a petition for court approval of the settlement and to serve the petition on the Fund. This Court distinguished Castille, supra, and Horil, supra, by finding that in those cases, the plaintiffs expected to recover excess damages from the Fund.[3] *478
*479 In Payne v. New Orleans General Hospital, 611 So.2d 777 (La.App. 4 Cir. 1992), the Louisiana Patient's Compensation Fund and Oversight Board could not intervene in a medical malpractice action prior to rendering judgment, settlement, or an award in arbitration; the medical malpractice act did not give the Fund status as a co-obligor or codefendant, and until settlement or judgment in excess of $100,000 had been rendered, the Fund did not have any standing to intervene.
In the present case the settlements of $25,000 to Charity and $10,000 to JoEllen Smith Hospital were amounts far below *480 the $100,000 limit of liability. (Charity was not specifically named as a defendant in plaintiffs two petitions. Further, although Charity was listed in the determination of fault in the jury interrogatories, Joe Ellen Smith Hospital was not.) Based on Giammanchere, supra, we infer that the plaintiffs believed that the greater amount of liability in the present case lay with Dr. Deno and Dr. Sherman. Because the settlements were below $100,000, the Fund could not intervene prior to the judgment.
Pursuant to Giammanchere, id., it must be determined if the plaintiff in the present case fulfilled the requirements of La. R.S. 40:1299.42(D)(5). At issue is whether the plaintiff met the notice requirement because there is no evidence that the Fund was given notice of the plaintiff's settlements with Charity and JoEllen Smith Hospital. La. R.S. 40:1299.42(D)(5) contains no time limit for giving written notification of a plaintiff's settlement with a qualified health care provider to the Fund. Moreover, the form of the notice is not specified.
In the present case, the fact that the Fund received notice of the settlement with the two hospitals is inferred as in Giammanchere, id. In the present case, with reference to the March 18, 1999 judgment, the Fund filed its petition for intervention on March 26, 1999. On March 29, 1999, the Fund filed its motion for new trial and/or motion for judgment not withstanding the verdict and/or motion for remittitur and/or motion to amend judgment, which references the settlements with Charity and JoEllen Smith Hospital. The Fund's counsel signed the blank for approval as to form only for the trial court's judgment of July 25, 1999. On July 23, 1999 the Fund filed a suspensive appeal. Just as in Giammanchere v. Ernst, the Fund did not intervene until after trial and after a judgment was reached. Under the circumstances, following Giammanchere, id., we find that the requirements of La. R.S. 40:1299.42(D)(5) were met. Accordingly, the exception of no cause of action, reviewed on behalf of the Fund, is denied.

Credit for Two settlements
Because the Fund had notice of the settlements, at issue is what amount of credit will the Fund receive for the two settlements.
Decisions interpreting La. R.S. 40:1299.44(C)(5) have made it clear that once one health care provider has settled for $100,000, liability for malpractice is admitted and the only issue between the victim and the Fund is the amount of damages. In Stuka v. Fleming, 561 So.2d 1371, 1374 (La.1990), cert. denied, 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990), the Louisiana Supreme Court stated:
The Medical Malpractice Act therefore contemplates that the issue of liability is generally to be determined between the malpractice victim and the health care provider, either by settlement or by trial, and that the Fund is primarily concerned with the issue of the amount of damages. Payment by one health care provider of the maximum amount of his liability statutorily establishes that the plaintiff is a victim of that health care provider's malpractice. Once payment by one health care provider has triggered the statutory admission of liability, the Fund cannot contest that admission. The only issue between the victim and the Fund thereafter is the amount of damages sustained by the victim as a result of the admitted malpractice.
However, in the present case the two settlements ($25,000 with Charity and $10,000 with JoEllen Smith Hospital) were for less than $100,000 each so that the *481 issue remains as to whether liability must be proved before the Fund can receive credit for the settlements.
The Medical Malpractice Act, La. R.S. 40:1299.42 D(5), provides:
In the event that a partial settlement is executed between the defendant and/or his insurer with a plaintiff for the sum of one hundred thousand dollars or less, written notice of such settlement shall be sent to the board. Such settlement shall not bar the continuation of the action against the patient's compensation fund for excess sums in which event the court shall reduce any judgment to the plaintiff in the of malpractice liability insurance in force as provided for in R.S. 40:1299.42(B)(2).
In the present case, the Fund received $100,000 credit for the medical malpractice liability of Dr. Deno who was the only party found liable at trial. In oral argument, the plaintiff referred to Roy v. Gupta, 606 So.2d 940 (La.App. 3 Cir.1992), writ denied, 609 So.2d 232 (La.1992), in which the Third Circuit gave only $100,000 credit because only one health care provider was found at fault. There had been three settlements under $100,000 each with three health care providers but the Third Circuit did not give credit to the funds for these settlements because the health care providers were not found to be liable. The Third Circuit stated:
The question becomes whether or not credit is given for all of the health care providers who are potentially liable and who participate in a settlement, or for only those involved in the settlement whose liability is proven by either an admission of liability by settling for the limits of liability or by obtaining a judgment of negligence and malpractice against them. There are good arguments for both sides. To allow a plaintiff to name several health care providers and settle with all for under the limit, and then amend the petition to allege the negligence of only one, gives the plaintiff a chance to recover from any and still expose the fund to a potential liability of $400,000.00. On the other hand, nothing prevents the fund from asserting as a defense the negligence of those parties not named at trial and having liability reduced by the amount of the settlement.
It is well entrenched in the jurisprudence that where there is a settlement for the limits of liability by the health care provider, the only remaining issue is quantum. The fund is not a party defendant, rather it is a statutory intervenor. See, Williams v. Kushner, 449 So.2d 455 (La.1984); Felix v. St. Paul Fire and Marine Ins. Co., 477 So.2d 676 (La.1985).
In this instance, however, liability is an issue. Furthermore, the only liability at issue was Dr. Gupta's. The amended petition alleged only his negligence. The judgment was rendered finding only him at fault. The other two health care providers were not named and not a party to the trial.
The statute mandates credit against the judgment for the amount of malpractice insurance in force for the liable health care provider. In the present case there is only one liable health care provider. The other two were relieved of liability.
Id., 606 So.2d at 946.
In Thomas v. Insurance Corp. of America, 93-1856 (La.2/28/94), 633 So.2d 136, the Louisiana Supreme Court interpreted La. R.S. 40:1299.42 D(b) to allow $100,000 credit for the one settlement and then a dollar-for-dollar amount for the second settlement. The Supreme Court stated:
Accordingly, in the case of multiple settlements, a single settlement between *482 a defendant and/or his insurer and the plaintiff for a sum of $100,000, or less than $100,000 but more than any other of multiple settlements, shall reduce by $100,000 any judgment in favor of the plaintiff to be paid by the Patient's Compensation Fund. Each other settlement shall reduce the amount due by the Fund by the amount of that settlement.
Id. at 141.
Thomas differs from the present case because in Thomas, one of the settlements was for $100,000, and therefore liability was admitted. In the appellate opinion. Thomas v. Insurance Corp. of America, 621 So.2d 67 (La.App. 2 Cir.1993), the Second Circuit reviewed Roy v. Gupta, supra, and distinguished it for that reason. The Second Circuit stated:

Roy v. Gupta is easily distinguished on its facts. No settling defendant or insurer, or even all of them combined, paid $100,000, so the Rule of Stuka [v. Fleming, 561 So.2d 1371 (La.1990) ], did not apply and the liability of all health care providers was an issue at trial. Further, we cannot agree with the opinion that states "The statute mandates credit against the judgment for the amount of malpractice insurance in force for the liable care provider." 606 So.2d 940, 945. We see no language in § 1299.42(D)(5) that says or implies a credit is due the Fund only for a settlement by a liable health care provider. The credit statute simply says a credit is due the Fund when the provider and/or his insurer pays $100,000 or less in settlement. Moreover, we see nothing in the statute that suggests that multiple credits are not due the Fund when multiple settlements with health care providers and/or their insurers are made.... [Emphasis added] Id., 621 So.2d at 69.
The Louisiana Supreme Court did not refer to Roy v. Gupta in its subsequent opinion in Thomas, supra. The Louisiana Supreme Court amended the Third Circuit's award that credited the Fund for the patient's $100,000 settlement with the hospital but not for the $40,000 settlement with the physician. The Louisiana Supreme Court held that the Fund was entitled to a $100,000 credit for the patient's settlement with the hospital and a $40,000 credit for the settlement with the physician. The Fund received credit for the physician although no assignment of fault was assigned to the physician who settled in Thomas.
We conclude that La. R.S. 40:1299.42(D)(5) does not require that credit can be given only to the defendants who are found liable for the reasons expressed by the Second Circuit as cited above.
In the present case the larger settlement was in the amount of $25,000. This is the amount that is calculated for the $100,000 credit to the Fund for the settlement with Charity. The Fund is entitled to an additional credit of $10,000 for the second settlement with JoEllen Smith Hospital for a total of $110,000 for the medical malpractice settled claims.

Summation of Revisions in Judgment
The trial court's final June 1999 judgment is affirmed in part, amended in part, and reversed in part.
The trial court's judgment notwithstanding the verdict, dismissing all claims against Dr. Ivan Sherman, is affirmed. The finding of sole fault assigned to Dr. Deno is affirmed. The trial court's order that the Louisiana Patients' Compensation Fund should receive credit of $100,000 for the judgment rendered against Dr. Richard Deno, is affirmed with respect to the *483 medical malpractice claims against Dr. Deno.
For the claim of patient dumping, beyond the medical malpractice cap, the plaintiff is awarded $4,400,000 in general damages to be paid by Dr. Deno. The award for special damages for loss of wages or diminished earning capacity in the amount of $500,000 is affirmed. The trial court's finding that the jury determined that the plaintiff is in need of future medical care and related benefits in the amount of $500,000 is noted.[4]
$100,000 credit is given to the Fund for the settlement with Charity. The Fund is given an additional credit of $10,000 for the second settlement with JoEllen Smith for a total of $110,000 for the medical malpractice settled claims. The trial court's decree of judgment against Dr. Deno for $98,971.70 with interest from the date of April 1, 1991 is affirmed, in addition to his liability for interest on damages above the medical cap. The Patients' Compensation Fund is responsible for the other interest on the amount of $400,000 minus $110,000 (for credit for the settled claims) or $290,000. Dr. Deno is assessed interest for the amount of the award for damages above the $500,000 medical malpractice cap. This is equal to $4,900,000 (general damages plus special damages for loss of wages or diminished earning capacity) minus $500,000 (medical cap) or the total amount of $4,400,000. Dr. Deno is liable for the plaintiff's future medical needs, which will be administered by the Oversight Board.
With respect to the plaintiffs son, Louis Frank Coleman, the award of $10,000 for loss of consortium is included in the amount of the judgment above the $500,000 medical malpractice cap against the defendant Dr. Deno. This award for loss of consortium is not allocated against the Louisiana Patients' Compensation Fund.
AFFIRMED IN PART; AMENDED IN PART; AND REVERSED IN PART.
PLOTKIN, J., dissents with written reasons.
KIRBY, J., dissents for reasons assigned by J. PLOTKIN.
PLOTKIN, J. Dissenting with Written Reasons.
This case involves a gross misapplication and misinterpretation of Louisiana tort law. I must dissent because I strongly disagree with two pivotal findings in the majority decision: (1) the finding that Mr. Coleman's claims against Dr. Richard Deno are not subject to the $500,000 cap imposed by the Louisiana Medical Malpractice Act ("MMA"), and (2) the finding that Dr. Deno is 100 percent liable for the loss of Mr. Coleman's arm. Moreover, the majority's finding that Mr. Coleman's claims do not fall under the provisions of the Louisiana MMA creates a conflict between this circuit and the First Circuit Court of Appeal's decision in Bolden v. Dunaway, 97 1425 (La.App. 1 Cir. 12/28/98), 727 So.2d 597. For the reasons discussed below, I would hold that Mr. Coleman's claims are subject to the limitations of the MMA and that Dr. Deno and Charity Hospital New Orleans ("CHNO") are equally liable for Mr. Coleman's damages. Accordingly, I would limit Mr. Coleman's damages to $500,000, and apportion fault 50 percent to Dr. Deno and 50 percent to CHNO.

*484 Facts
The uncontested facts in this case are as follows:
Mr. Coleman first presented himself at Jo Ellen Smith Hospital ("JESH") at about 1:44 a.m. on June 7, 1988, complaining that he had pulled something in his chest while lifting an item at work and that "all movement hurts," even breathing. He was seen by Dr. Sherman, an emergency room physician. Dr. Sherman found that Mr. Coleman's chest was clear, but that his chest wall was "tender." Although Mr. Coleman's temperature was 100.2 degrees, all his other vital signs were normal. Dr. Sherman ordered an EKG and a chest x-ray, which were normal. Dr. Sherman diagnosed Mr. Coleman with chest pain and costochondritis, and prescribed Naprosyn twice a day with meals. When Mr. Coleman was discharged, Dr. Sherman told him to apply heat to his chest and see his personal physician for follow up. Mr. Coleman did not complain about his left arm on that visit to JESH.
The next day, June 8, 1988, at 8:10 p.m., Mr. Coleman again presented at JESH emergency room. This time he complained that his left arm had started to swell and ache that morning. The triage nurse noted that Mr. Coleman's arm was swollen and that it was warm to the touch with bullae in the left antecubital space. Other than an elevated heart rate of 120 beats per minute and a temperature of 102.8 degrees, Mr. Coleman's vital signs were normal. Mr. Coleman was attended by Dr. Deno, who ordered laboratory work, which revealed an elevated white blood count of 27,100.
Dr. Deno diagnosed Mr. Coleman with left-arm cellulitis, and concluded that Mr. Coleman should receive inpatient intravenous antibiotic therapy. However, rather than admit him to JESH, a Level Two Trauma Center, Dr. Deno elected to contact the charge resident in the accident room at CHNO and arrange a transfer through the emergency room at CHNO, a Level One Trauma Center. After Dr. Deno was certain that the CHNO charge resident had accepted Mr. Coleman for treatment, Dr. Deno released Mr. Coleman to go to CHNO. Because Mr. Coleman was ambulatory and because he was in good condition, Dr. Deno did not order a transfer by ambulance. Mr. Coleman signed the record prepared by Dr. Deno documenting his decision to transfer Mr. Coleman to CHNO. Dr. Deno gave Mr. Coleman a copy of the results of the laboratory tests performed at JESH and discharged him to go to CHNO at 10 p.m.
Dr. Coleman arrived at CHNO on June 9, 1988 at 12:21 a.m., and saw a physician before 1:30 a.m. At that time, blood work, including a complete blood count, blood chemistries, and blood cultures, was performed. The doctor noted that Mr. Coleman's left arm was "swollen and warm from the mid arm to lower forearm, with no fluctuant areas, no streaking, positive axillary node and positive track marks." Mr. Coleman's white blood count was elevated to 29,900. The CHNO records indicate that Mr. Coleman suggested two possible causes of the left arm problem: (1) a "crushing type injury" several days before "when he fell off boat and was wedged between wharf and boat," and (2) an incident also several days prior to his hospital admission when "some people injected something into his arm while holding him down" at a party. However, x-rays performed at 5 p.m. showed no gas in the tissues.
The CHNO emergency room physician diagnosed "cellulitis, probable intravenous drug abuse, likely staph or strep infection, and rule out sepsis." The physician prescribed admission for intravenous antibiotics, tetanus toxoid administration, elevation *485 of and warm compresses to the left arm, and additional blood studies. Mr. Coleman started receiving antibiotics intravenously at 8 a.m. The CHNO records indicate that on June 11, 1988, Mr. Coleman was responding to treatment with Nafcillin.
On June 11, 1988, a surgical consult was ordered. Dr. Redmond saw Mr. Coleman for the first time at approximately 1 p.m. that day, when he noted that Mr. Coleman's arm was draining an extremely foulsmelling pus from the antecubital fossa. Dr. Redmond recommended surgery to explore Mr. Coleman's arm. X-rays taken at 2 p.m. indicated the presence of air in Mr. Coleman's left arm. At 4:10 p.m., surgery began. During surgery, Dr. Redmond discovered that the skin, fat, and the bulk of muscles in Mr. Coleman's left arm were dead. After consulting with an orthopedic surgeon, Dr. Redmond elected to perform an open left shoulder disarticulation in order to save Mr. Coleman's life. Cultures revealed that Mr. Coleman's left arm had become infected with peptostreptococcus, as well as alpha and beta streptococcus. Mr. Coleman was discharged from CHNO on June 28, 1988.

Application of Medical Malpractice Act
Following the lengthy trial in this case, the jury held that Dr. Deno, the JESH emergency room physician who treated Mr. Coleman on June 8, 1988, was 80 percent liable for Mr. Coleman's injuries and awarded Mr. Coleman $4.4 million in general damages and $500,000 in special damages. However, the trial court, in its "Annotated March 18, 1999 Judgment," found that the judgment was subject to the statutory limitations established by the Louisiana MMA, and limited Mr. Coleman's recovery to $500,000. The majority reverses the trial court's finding that the judgment is subject to the MMA, and reinstates the original jury verdict. However, it is important to note that under the circumstances of the instant case, the majority's decision to reinstate the jury verdict is not based on any deference to a factual finding made by the jury. In fact the majority's decision, though not characterized as such, involves the reversal of a trial court decision on an issue of lawi.e., whether Mr. Coleman had a cause of action against Dr. Deno under the provisions of EMTALA. The majority improperly reverses the trial court's decision on that legal issue without finding that the trial court committed manifest error.
During the June 8, 1988, visit, Dr. Deno correctly diagnosed Mr. Coleman as suffering from left-arm cellulitis, and properly concluded that Mr. Coleman needed inpatient intravenous antibiotic therapy. However, according to Dr. Deno's testimony at trial, because he also worked at CHNO, he knew that Mr. Coleman would receive better treatment at CHNO, which had a Level One Trauma Center, than he could receive at JESH, which was a Level Two Trauma Center with limited capabilities. Thus, Dr. Deno contacted the charge resident at CHNO and arranged to have Mr. Coleman admitted immediately through the CHNO emergency room. According to his deposition testimony, Dr. Deno asked Mr. Coleman whether he had insurance prior to the transfer. Mr. Coleman signed the form documenting Dr. Deno's decision to transfer him to CHNO for intravenous antibiotic treatment. Mr. Coleman now claims, and the majority implicitly finds, that Dr. Deno improperly "dumped" Mr. Coleman on CHNO for economic reasons.
In his petition for a medical review panel, filed on July 27, 1990, all of Mr. Coleman's allegations against Dr. Deno are based purely in negligence; there is no mention of his "dumping" Mr. Coleman on another hospital. As the majority notes, *486 Mr. Coleman alleged in his original petition that Dr. Deno and JESH were negligent under the MMA and specifically stated that their negligence was covered by the MMA. Additionally, he claimed that Dr. Deno and JESH failed to properly diagnose or treat his left arm. However, by his First Supplemental and Amended Petition filed on March 27, 1991, Mr. Coleman alleged that JESH and Dr. Deno were liable for violation of the federal Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), and particularly under the "anti-patient dumping" provisions of that Act. There are absolutely no allegations in either of Mr. Coleman's petitions that Dr. Deno violated Louisiana's Anti-Patient Dumping Statute, LSA-R.S. 40:2113.4 through 40:2113.6, or Louisiana general tort law, La. C.C. art. 2315.
Prior to trial, but after Mr. Coleman had settled with both the hospitals named as defendants in his petition, the trial judge court granted an exception of no cause of action on the federal anti-patient dumping issue alleged in Mr. Coleman's First Supplemental and Amending Petition, presumably because EMTALA applies only to hospitals, not to individual physicians. See Spradlin v. Acadia-St. Landry Medical Foundation, 98-1977, p. 4 (La.2/29/00), 758 So.2d 116, 119. At the same time, the trial court granted a motion in limine prohibiting Mr. Coleman from referring to his lack of insurance at trial. Mr. Coleman did not seek supervisory writs concerning the granting of the exception of no cause of action and motion in limine. The issue therefore was not presented to the jury, and the jury did not make any finding on the anti-patient dumping issue. Accordingly, the proper standard of review in this case is whether the trial court was manifestly erroneous in granting the motion in limine on the EMTALA allegations.
Both federal law and Louisiana state law contain Anti-Patient Dumping provisions. See Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd; LSA-R.S. 40:2113.4 through 4-2113.6. In granting the exception of no cause of action and the motion in limine on that issue, the trial court implicitly found that Mr. Coleman had no cause of action under any anti-patient dumping provision, federal or state. Moreover, when he granted the exception and motion on the anti-patient dumping issues, the trial court essentially found that all of Mr. Coleman's claims were subject to the Louisiana MMA. Accordingly, the trial court applied the limitations of the Act to the jury verdict.
The majority never finds that the trial court improperly granted the motion in limine on the EMTALA issues; indeed, the majority concedes that Mr. Coleman had no cause of action against Dr. Deno under EMTALA, the only anti-patient dumping provision referenced in Mr. Coleman's petition, because that provision applies only to hospitals, not to individual physicians. Spradlin, 98-1977 at 4, 758 So.2d at 119. Instead, the majority frames the issue to be decided in order to determine whether Mr. Coleman's claims fall under the limitations of the MMA as follows: "At issue is whether the plaintiff timely stated a cause of action in his pleadings under La. R.S. 40:2113.4 or Louisiana general tort law for patient dumping." However, as noted, Mr. Coleman never mentions either of those provisions in either of his petitions. The majority's reversal of the trial court's finding that all of Mr. Coleman's claims are subject to the limitations of the Louisiana MMA is then explained as follows:
In the present case, in his amended petition, Coleman referred to a cause of action based on the negligent failure of the defendants to treat the plaintiff, as *487 well as an intentional tort based on the federal anti-dumping provisions related to the transfer of a patient to another hospital for lack of funds. The Medical Malpractice Act only encompasses unintentional acts of negligence and contractual issues. JoEllen Smith Hospital's policy provided that every emergency room patient must receive appropriate treatment before discharge or transfer, regardless of financial status. The "patient dumping" cause of action refers to an intentional tort where Dr. Deno directed plaintiff's transfer to Charity for lack of finances or insurance although it conflicted with JoEllen Smith Hospital's written policy. We find no express state law that excludes recovery under La. C.C. art 2315, general tort law, or La. R.S. 40:2113.4-40:2113.6 against physicians for the intentional tort of patient dumping. The plaintiff's reference to anti-dumping statutes states a cause of action against the physician under Louisiana law.
Considering that the Medical Malpractice Act must be strictly construed against limiting the tort claimant's rights against the wrongdoer, Coleman's amended petition states a cause of action against the physician, Dr. Deno, beyond the scope of Louisiana Medical Malpractice Act, thereby entitling the plaintiff to the jury award that is not subject to the Act's $500,000 cap.
For the reasons explained below, I believe that the majority's conclusion is fatally flawed.
The majority's conclusion that Mr. Coleman's claims are not subject to the limitations of the MMA is best analyzed by examining each underlying premise asserted by the majority prior to reaching that conclusion. The majority's premises may be summarized as follows:
1. Mr. Coleman "referred to" a cause of action based on negligent failure to treat, as well as an intentional tort based on EMTALA provisions related to the transfer of a patient to another hospital for lack of funds.
2. The MMA only encompasses unintentional acts of negligence and contractual issues.
3. JESH's written policy provided that every emergency room patient must receive appropriate treatment before discharge or transfer, regardless of financial status.
4. Dr. Deno directed Mr. Coleman's transfer to CHNO for lack of finances or insurance, in violation of JESH's written policy.
5. No express Louisiana law "excludes recovery" under general tort law or Louisiana's Anti-Patient Dumping Statute against physicians for the intentional tort of patient dumping.
I will examine each of the above premises under the applicable law and record evidence presented in this case.
In its first premise, the majority cites to Mr. Coleman's allegations in his First Supplemental and Amending Petition, and finds that Mr. Coleman's allegations were sufficient to refer to two different causes of actionone for negligent failure to treat and one for intentional tort. Concerning the first cause of actioni.e., negligent failure to treatthose allegations unquestionably fall under the limitations of the Louisiana MMA. In fact, "malpractice" is defined for purposes of the MMA in LSA-R.S. 40:1299.41(A)(8), as follows:
Any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of the patient, including loading *488 and unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
(Emphasis added.) Mr. Coleman alleged in his original petition that his claims against the defendants were subject to the MMA: accordingly. I have no quarrel with the majority's conclusion that Mr. Coleman stated a cause of action for negligent failure to treat, subject to the provisions of the MMA.
Concerning the second cause of action i.e., intentional tortthe majority essentially concludes that the following allegations in Mr. Coleman's First Supplemental and Amending Petition are sufficient to state a cause of action in intentional tort under Louisiana general tort law:
22 A.
As a hospital receiving Medicare benefits for patient treatment, and/or as a physician employed by said hospital and/or treating such patients, the defendants JoEllen Smith Hospital and Dr. Richard Deno were obligated by federal law not to transfer Louis Coleman or direct him as a patient to Charity Hospital, without first being certain that his condition was stabilized and that no material deterioration of his condition likely would result from the delay between his leaving JoEllen Smith Hospital and his arriving at Charity Hospital; and, accordingly, said defendants were negligent per se in regard to the above sequence of events, for having violated the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), added as a section to the Social Security Act, including, but not limited to, the provisions set forth in Section 1967 of the latter Act.
* * * * *
e) The failure on the occasion of the second emergency room visit of June 8, 1988, to adhere to the "anti-dumping" provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), including, but not limited to provisions set forth in § 1867 of the Social Security Act, for which violation the defendant and/or defendants would be liable on the basis of negligence per se.

(Emphasis added.) I quote the above allegations in their entirety only to show the fallacy in the majority's conclusion that Mr. Coleman's petition refers to an intentional tort under Louisiana general tort law. Not only does Mr. Coleman fail to expressly refer to an intentional tort of any kind, he specifically asserts that the defendants' alleged violation of EMTALA provisions results in "negligence per se." All allegations of negligence on the part of a physician in providing professional services unquestionably fall under the provisions of the Louisiana MMA. See Spradlin, 98-1977 at 4, 758 So.2d at 119. In fact, this conclusion is inherent in the majority's second premise on which it bases its finding that Mr. Coleman's allegations fall outside the limitations of the MMAi.e., that the MMA only encompasses unintentional acts of negligence and contractual issues. I should state here that I agree with the majority's second premise, which is simply a statement of law, not an interpretation of the allegations or facts in this appeal.
More important to this case, however, is the fact all of Mr. Coleman's allegations in his First Supplemental and Amending Petition are clearly based on the federal EMTALA provisions, not on Louisiana general tort law, or even the Louisiana Anti-Patient Dumping Statute. The majority *489 concedes that the trial court properly found that Mr. Coleman had no cause of action against Dr. Deno based on EMTLA because that provision applies only to hospitals, not to individual physicians. See Spradlin, 98-1977 at 4, 758 So.2d at 119. However, the majority concludes, without any citation to any allegations to that effect in either of Mr. Coleman's petitions, that his allegations refer to an intentional tort based on EMTALA. The majority fails to cite any authority for the conclusion that the EMTALA allegations constitute intentional torts. Accordingly, I disagree with the first premise forming the basis of the majority's conclusion that Mr. Coleman's allegations fall outside the limitations of the Louisiana MMA.
In its third premise, the majority asserts that JESH had a written policy that provided that every emergency room patient must receive appropriate treatment before discharge or transfer, regardless of financial status. The record does indeed reflect such a written policy. Although not quoted by the majority, Dr. Paul Blaylock, an emergency physician in Portland, Oregon, read the following excerpt from JESH's Emergency Department policy manual:
Each and every patient with a new illness or injury requesting attention will be promptly seen and evaluated by a physician and receive appropriate treatment before discharge or transfer, regardless of his condition or financial status.
It is not the accuracy of the majority's premise based on the above policy that concerns me in this case, but the majority's application of this policy to the facts. Applying that policy to the facts in this case, the majority concludesin its fourth premisethat Dr. Deno directed Mr. Coleman's transfer to CHNO for lack of finances or insurance, in violation of JESH's written policy. The majority cites no record evidence to support this finding, but simply makes a conclusory statement to that effect.
However, the record evidence, as I read it, does not support the majority's fourth premise. Given the fact that the trial court granted Dr. Deno' exception of no cause of action and motion in limine on the federal patient-dumping issue, coupled with the fact that Mr. Coleman failed to seek supervisory review of those rulings, the parties were prohibited from presenting evidence on the issue. In order to find that Dr. Deno violated JESH's written policy relative to transfer of a patient, the majority had to make two implicit factual findings: (1) that Dr. Deno's decision to transfer Mr. Coleman's was motivated by his condition or financial status, and (2) that Mr. Coleman was not "promptly seen and evaluated by a physician" or that he did not "receive appropriate treatment before" his transfer.
Concerning Dr. Deno's motivation for transferring Mr. Coleman to CHNO, the only direct record evidence of Dr. Deno's reason for transferring Mr. Coleman to CHNO is Dr. Deno's own statements that he knew CHNO had better laboratory equipment and more experience than JESH dealing with infections of the type experienced by Mr. Coleman. The reason Dr. Deno knew this fact was that he worked in the CHNO emergency room, as well as the JESH emergency room. Moreover, CHNO is universally acknowledged as the preferred treatment center in the Greater New Orleans area for any type of trauma. The fact that Dr. Deno admitted in his deposition that he asked Mr. Coleman if he had insurance prior to transferring him to CHNO is not proof that his lack of insurance was the motivating consideration in Dr. Deno's decision to transfer him, especially in light of the fact that no one can or does contest Dr. Deno's *490 statement that CHNO was the best facility in the area to treat Mr. Coleman's illness.
Further, Mr. Coleman does not allege, and the majority does not find, that he was not "promptly seen and evaluated" by Dr. Deno, as required by JESH policy, prior to his transfer. The majority's conclusion is therefore apparently based on a finding that Mr. Coleman did not "receive appropriate treatment before ... the transfer," as required by the JESH policy. However, Dr. Deno testified extensively to his conviction that Mr. Coleman was stable, alert, and ambulatory at the time of the transfer. Mr. Coleman does not contradict Dr. Deno's characterization of his condition. Moreover, Mr. Coleman clearly understood and consented to Dr. Deno's decision to transfer him to CHNO because he would receive better treatment there, as evidenced by his signature on the form documenting the transfer.
Mr. Coleman and his experts suggested at trial that Dr. Deno should have given Mr. Coleman a dose of antibiotics prior to his release from JESH. On the other hand. Dr. Deno testified that giving him a dose of antibiotics prior to the transfer would have contaminated blood cultures at CHNO. Dr. Deno's decision not to give Mr. Coleman a dose of antibiotics was obviously based on his medical expertise and does not support a finding that Mr. Coleman did not receive appropriate treatment prior to the transfer.
In its fifth premise, the majority finds that no express Louisiana law excludes recovery under general tort law or Louisiana's Anti-Patient Dumping Statute against physicians for the intentional tort of patient dumping. This is the conclusion reached by the majority that most troubles me in this case. The primary reason for that concern is that the majority's conclusion completely begs the question. The only real question in this caseas in any caseis whether the statutory scheme adopted by the Louisiana legislature, taken as a whole, allows recovery under the particular set of facts. A finding that no express state law excludes recovery under particular provisions is disingenuous because it ignores the pertinent question. My secondary concern about the majority's fifth premise is that it ignores important tenets of Louisiana's statutory scheme.
Concerning the Louisiana Anti-Patient Dumping Statute, the majority concedes that LSA-R.S. 40:2113.4 through 40:2113.6 contains no express private right of action. Spradlin, 98-1977 at 8, 758 So.2d at 121. Nevertheless, the majority finds that the Statute does not exclude a private right of action. However, as explained below, that conclusion violates both the wording and the purpose of LSA-R.S. 40:2113.4 through 40:2113.6.
The Louisiana Anti-Patient Dumping Statute was enacted by the 1980 Louisiana Legislature "to establish a statutory duty on the part of certain hospitals to provide emergency services to all persons residing in the territorial area, regardless of whether they are insured or able to pay." Id. at 7, 758 So.2d at 120 (emphasis added). The purpose of the statute "was to override the common law rule that hospitals have no duty to provide treatment." Id. at 7, 758 So.2d at 121 (emphasis added). All of the duties specified in the statutes are duties owed by "general hospitals" meeting certain criteria, and "officers, employees, and members of the medical staffs" of such hospitals. In fact, LSA-R.S. 40:2113.6 specifically prohibits such officers, employees, and members from denying emergency services "to a person diagnosed by a licensed physician as requiring emergency services." The penalty provisions of the statute apply only to those officers, employees, and members of the medical staffs of such hospitals, a group that the statute *491 clearly distinguishes from "licensed physicians." Accordingly, the very wording of Louisiana's Anti-Patient Dumping Statute indicates that it was never intended to be applied to physicians.
Moreover, my research indicates that no Louisiana court has ever applied Louisiana's Anti-Patient Dumping Statute to a physician. See Spradlin, 98-1977, 758 So.2d 116; Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228; Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La.1990); Terrebonne v. Floyd, 99 0766 (La.App. 1 Cir. 5/23/00), 767 So.2d 758; Bolden v. Dunaway, 97 1425 (La.App. 1 Cir. 12/28/98), 727 So.2d 597, writ denied, 99-0275 (La.3/26/99), 739 So.2d 801; Spradlin v. Acadia-St. Landry Medical Foundation, 97-845 (La.App. 3 Cir. 1/21/98), 711 So.2d 699, aff'd, 98-1977, 758 So.2d 116; Torbert v. Licciardi, 94-2026 (La.App. 4 Cir. 4/24/96), 673 So.2d 1213, writs denied, 96-1168, 96-1302 (La.6/21//96), 675 So.2d 1082; Gordon v. Willis Knighton Medical Center, 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, writ denied, 95-2776, 95-2783 (La.1/26/96), 666 So.2d 679.
In fact, none of the cases cited by the majority in which Louisiana courts considered the application of the Louisiana Anti-Patient Dumping Statute can reasonably be interpreted to allow a cause of action under LSA-R.S. 40:2113.4 through 40:2113.6 against an individual physician. In most of the cases the majority cites, including Spradlin, 98-1977, 758 So.2d 116, Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La.1990), and Fleming v. HCA Health Services Of Louisiana, Inc., 96-1968 (La.4/8/97), 691 So.2d 1216, the only defendants are hospitals. In Bolden, 97 1425, 727 So.2d 597, the only defendant is a physician, but the only reference to Louisiana's Anti-Patient Dumping Statute in the case is found in a paragraph distinguishing the case from Spradlin. Thus, they do not support the majority's conclusion that no express state law excludes recovery against an individual physician under LSA-R.S. 40:2113.4 through 40:2113.6 under the allegations of Mr. Coleman's petition.
In fact, the only reasonable interpretation of all the cases cited above, when considered together, is that Mr. Coleman's claims are excluded under the statute because the statute is simply not designed to allow Mr. Coleman to seek recovery from an individual physician, like Dr. Deno, under its provisions. The reason for the statute's design is obviousindividual physicians working in a hospital have nothing to lose by providing medical treatment to a patient who lacks the financial resources to pay for treatment. The physician is paid regardless of whether the patient pays for treatment; it is the hospital that has incentive to refuse treatment to patients lacking insurance, not the individual physician.
The majority also finds that no express state law excludes recovery under Louisiana general tort law, La. C.C. art. 2315, "against physicians for the intentional tort of patient dumping." I vehemently disagree with the majority's suggestion that a physician's failure to treat can be considered to constitute an intentional tort falling outside the Louisiana Medical Malpractice Statute. In fact, that exact proposition has previously been correctly rejected by another Louisiana appellate court. In Bolden v. Dunaway, 97 1425 (La.App. 1 Cir. 12/28/98), 727 So.2d 597, cited by the majority, the court found specifically that allegations that a surgeon refused to perform surgery because the patient failed to make proper financial arrangements, despite the fact the patient had been prepared for surgery, did not state a cause of action in intentional tort, *492 but fell under the provisions of the Medical Malpractice Act. The court stated, in pertinent part, as follows:
In general, any conduct by a health care provider complained of by a patient is properly within the scope of the Medical Malpractice Act if it can reasonably be said that it comes within the definitions therein, even though there are alternative theories of liability. See Rogers v. Synthes, Ltd., 626 So.2d 775, 777 (La.App. 2d Cir.1993) (suit against hospital came under the Act even though plaintiff characterized her suit as one in strict product liability and redhibition); compare Hidalgo v. Wilson Certified Express, Inc., 94-1322 (La.App. 1st Cir.5/14/96), 676 So.2d 114 (suit for injuries sustained by patient while she was being transported in ambulance did not come under the Act because it was a suit involving negligent driving, not negligent health care). In enacting the Medical Malpractice Act, the legislature recognized the traditional rule of law allowing recovery for medical malpractice based on a physician-patient relationship that exists as the result of an express or implied contract and where the physician breaches either the contract or his or her professional duty to the patient. Hutchinson, 93-2156 at pp. 6-7, 637 So.2d at 421.
The allegations in the instant case state a cause of action for malpractice as defined by statute. Plaintiffs allege that the defendant doctor failed to render the professional services of assisting with her surgery as he had agreed to do. The alleged failure, if proven, is a breach of contract based on a failure to render professional services which should have been rendered in a timely fashion. Despite the attempt by plaintiffs in their amending petition to avoid the provisions of the Medical Malpractice Act by restructuring their allegations, we find that the clear and unambiguous wording of La. R.S. 40:1299.41 A(8) encompasses all of the acts complained of in plaintiffs' petitions.
Id. at 5, 727 So.2d at 600. As indicated by the above quotation, the basis of the court's finding in Bolden that the plaintiffs' claims against the physician who failed to provide treatment fell under the MMA was the fact that the physician's actions did not constitute an intentional tort. The majority's suggestion that the distinguishing factor between the instant case and Bolden is the existence of a contract is incorrect. The "contract" in Bolden arose only from the physician's'"failure to render professional services which should have been rendered in a timely fashion." Under that definition, Dr. Deno had a contractual relationship with Mr. Coleman. The majority's conclusion to the contrary in this case creates a conflict between the circuits on the issue of whether a physician's failure to treat is covered by the Louisiana MMA.
Moreover, the majority's conclusion that Mr. Coleman's allegations that Dr. Deno denied him treatment at JESH for economic reasons is sufficient to state a cause of action in intentional tort, not subject to the limitations of the Medical Malpractice Act, represents a dramatic departure from previous Louisiana jurisprudence, creating other conflicts between the circuits. The Louisiana statutory scheme clearly distinguishes between the duties of hospitals and the duties of physicians. That distinction was explained by the Louisiana Supreme Court in Spradlin, 98-1977, 758 So.2d 116, as follows:
The term "malpractice" has its roots (and relevance) in differentiating professionals from nonprofessionals for purposes of applying certain statutory limitations on tort liability. Health care providers are said to "practice" their profession and their negligence in providing *493 such professional services is called malpractice.
On the other hand, hospitals, which are the only health care providers covered by EMTALA, are distinct legal entities that do not, in the traditional sense of the word, "practice" medicine.
Id. at 4, 758 So.2d at 119. The above quotes indicates that claims against individual physicians arising out of their treatment or failure to treat always fall under the limitations of the Louisiana MMA.
In fact, the Bolden court noted that the Louisiana cases cited by the plaintiff in which the court found that a physician had committed an intentional tort outside the Medical Malpractice Act all involved "physical acts against the person of the plaintiff, not the failure to perform an agreement to provide medical care such as we have in the instant case." Id. at 6, 727 So.2d at 601, citing Baham v. Medical Center of Louisiana at New Orleans, 95-2605 (La.App. 4 Cir. 5/8/96), 674 So.2d 458; Reaux v. Our Lady of Lourdes Hospital, 492 So.2d 233 (La.App. 3 Cir.), writ denied, 496 So.2d 333 (La.1986); Leger v. Delahoussaye, 464 So.2d 1 (La.App. 3 Cir. 1984); Head v. Erath General Hospital, Inc., 458 So.2d 579 (La.App. 3 Cir.1984), writ denied, 462 So.2d 650 (La.1985). Neither Mr. Coleman nor the majority has cited any cases in which a failure to treat was found to constitute an intentional act, nor have I been able to find any. In fact, the majority cites Bolden, 97-1425, 727 So.2d 597, as follows: "In general, any conduct by a health care provider complained of by a patient is properly within the scope of the Medical Malpractice Act if it can reasonably be said that it comes within the definition therein, even though there are alternative theories of liability." Id. at 5, 727 So.2d at 600. Certainly, the conduct by Dr. Deno that Mr. Coleman complains abouti.e., transferring him to CHNOcomes within the definition of malpractice for purposes of the Louisiana Medical Malpractice Act. In fact, the definition of "malpractice" for purposes of the MMA, quoted above, expressly includes "failing to render services timely."
Once it determined that Mr. Coleman had no cause of action under EMTALA because it applies only to hospitals, or under the Louisiana Anti-Patient Dumping Statute, because it contains no express private cause of action, the trial court correctly found that all of Mr. Coleman's claims against Dr. Deno clearly fell under the limitations of the MMA. Accordingly, I would affirm the trial court judgment limiting Mr. Coleman's recovery to $500,000, consistent with the provisions of the Louisiana MMA.

Apportionment of fault
The jury in this case assigned 100 percent of the liability for Mr. Coleman's damages to Dr. Deno and assigned zero liability to CHNO; the majority affirms that apportionment of fault. However, based on the overwhelming evidence of fault on the part of CHNO that is evident from the majority's own recitation of facts in this case, I would modify the apportionment of fault to assign 50 percent liability to Dr. Deno and 50 percent liability to CHNO.
Concerning Dr. Deno's liability for Mr. Coleman's damages, the record contains evidence that Mr. Coleman might not have lost his arm had Dr. Deno started giving him intravenous antibiotics prior to his transfer, then had him transferred by ambulance, rather than allowing Mr. Coleman the opportunity to delay the time at which he reported to CHNO. The record is clear that Mr. Coleman did not report to CHNO emergency room until some two to three hours after being released by Dr. Deno. Dr. Deno attempted to explain his decision to send Mr. Coleman directly to CHNO; *494 however, the record contains ample other evidence to support the jury's finding that Dr. Deno's actions qualified as malpractice that did contribute to the loss of Mr. Coleman's left arm.
However, as noted in the majority opinion, the surgeon, Dr. Redmond, testified that the "compartment syndrome" which resulted in the loss of Mr. Coleman's arm developed the same day that the amputation occurred, three days after Dr. Deno saw Mr. Coleman and transferred him to CHNO, indicating that much of the liability for Mr. Coleman's damages must be assigned to CHNO. The majority notes that x-rays taken at CHNO at 5 a.m. on June 9, 1988, showed "significant soft tissue swelling but no gas in the tissues." The majority also notes that the June 9, 1988, "nurses' notes do not show additional swelling or worsening of the plaintiff's left arm." According to the majority, the June 11, 1988, hospital notes report that Mr. Coleman's "cellulitis with staph was responding to treatment with Nafeillin." Although not reported by the majority, the record evidence indicates that the attending physician planned to consult surgery on June 10, 1988, but that no surgeon saw Mr. Coleman until 1 p.m. on June 11, 1988, just hours before his surgery to amputate his arm. Finally, the majority cites the testimony of the surgeon, Dr. Clyde Redmond, that the compartment syndrome that resulted in the amputation of Mr. Coleman's arm developed within a few hours of the surgery. Accordingly, I would assign 50 percent of the liability for Mr. Coleman's damages to CHNO.
NOTES
[1] COBRA currently is known as the Emergency Medical Treatment and Active Labor Act ("EMTALA").
[2] In Spradlin, the Louisiana Supreme Court stated:

Requiring separate suits based on related claims growing out of the same transaction or occurrence appears to be judicially inefficient and may produce inconsistent results. However, the court in the EMTALA action (which must be filed within two years) may consider whether it is appropriate under the particular facts and circumstances to grant a motion to stay that action, while urging expeditious action in the medical review panel proceeding. In any event, plaintiffs are entitled to recover damages on both claims, whether in one or two trials, if the different requirements of proof are met, despite the fact that the law requires exhaustion of an administrative remedy in one action that is not applicable to the other.
Id., pp. 13-14, 758 So.2d at 124.
[3] In Giammanchere v. Ernst, supra. 742 So.2d at 579-581 this Court stated that:

The LPFC [Fund]'s exception of no cause of action is based on its contention that the plaintiffs lost their right to proceed against the LPFC [Fund] for recovery when they failed to follow the requirements established by LSA-R.S. 40:1299.44(C), which provides, in pertinent part, as follows:
C. If the insurer of a health care provider or a self-insured health care provider has agreed to settle its liability on a claim against its insured and claimant is demanding an amount in excess thereof from the patient's compensation fund for a complete and final release, then the following procedure must be followed:
(1) A petition shall be filed by the claimant with the court in which the action is pending against the health care provider, if none is pending in the parish where plaintiff or defendant is domiciled seeking (a) approval of an agreed settlement, if any, and/or (b) demanding payment of damages from the patient's compensation fund.
(2) A copy of the petition shall be served on the board, the health care provider and his insurer, at least ten days before filing and shall contain sufficient information to inform the other parties about the nature of the claim and the additional amount demanded.
Specifically, the LPCF [Fund] claims that the plaintiff failed both to file a petition for court approval of the settlement and to serve the petition on the LPCF [Fund].
The plaintiffs concede that they failed to meet the requirements of LSA-R.S. 40:1299.44(C), but claim that LSA-R.S. 40:1299.44(C) does not apply under the circumstances of the instant case. Instead, the plaintiffs claim that they were required only to meet the more general requirements established by LSA-R.S. 40:1299.42(D)(5), which provides as follows:
In the event that a partial settlement is executed between the defendant and/or his insurer with a plaintiff for the sum of one hundred thousand dollars or less, written notice of such settlement shall be sent to the board. Such settlement shall not bar the continuation of the action against the patient's compensation fund for excess sums in which event the court shall reduce any judgment to the plaintiff in the amount of malpractice liability insurance in force as provided for in R.S. 40:1299.42(B)(2).
Determination of whether LSA-R.S. 40:1299.44(C) or R.S. 40:1299.42(D)(5) applies to the instant case depends on this court's interpretation of the Louisiana Supreme Court's decision in Horil v. Scheinhorn, 95-0967 (La.11/27/95), 663 So.2d 697. In that case, the plaintiff had settled his case against the qualified health care provider for the full $100,000, and had subsequently sought additional damages from the LPCF [Fund]. The court held "that a claimant expecting excess recovery from the Fund must closely follow La. R.S. 40:1299.44(C) when requesting court approval of a settlement." Id. at 1, 663 So.2d at 698 (emphasis added). However, the plaintiffs argue that the Horil decision should not be interpreted to require compliance with LSA-R.S. 40:1299.44(C) under the circumstances of this case because they did not expect to recover excess damages from the LPCF [Fund]. In support of this argument, they note that their settlement with Dr. Mandich was for $31,500, an amount far less than the $100,000 limit of liability applicable to Dr. Mandich.
However, the LPCF [Fund] correctly points out that the Louisiana Third Circuit Court of Appeal has interpreted Horil to require compliance with the provisions of LSA-R.S. 40:1299.44(C) anytime a plaintiff attempts "to obtain excess damages from the PCF." Casttlle v Our Lady of Lourdes Regional Medical Center. 96-1476, p. 3 (La.App. 3 Cir. 4/2/97), 692 So.2d 1303, 1305. In that case, the plaintiff settled his claim with the qualified medical provider for $75,000 in a settlement which was approved by the court and which contained a reservation of rights against the LPCF [Fund]. Id. at 1, 692 So.2d at 1304. The plaintiffs also amended their original petition to name the LPCF [Fund] as a defendant: however, the requirements of LSA-R.S. 40:1299.44(C) were not met. The Third Circuit affirmed a trial court judgment granting a summary judgment in favor of the defendant in Castille, stating as follows:
The [ ] provisions [of LSA-R.S. 40:1299.44(C) ] require that the board be served with a copy of the petition for approval of a settlement including any demand for payment of excess damages from the fund, and that the PCF [Fund] be given an opportunity to introduce evidence at the hearing on that petition. In this case, the PCF [Fund] was not given notice prior to the hearing on the settlement and was not given an opportunity to present evidence with regard to the demand for excess damages. As the supreme court stated in Horil [v Scheinhorn], 95-0967 (La.11/27/95), 663 So.2d 697, there is no provision for a separate settlement vehicle. The plaintiffs here in did not comply with the provisions of La. R.S. 40:1299.44(C). As a result, under the holding of Horil, 95-0967, 663 So.2d 697, the trial court correctly dismissed the plaintiffs' claims against the PCF [Fund].
The LPCF [Fund] claims that the facts of the instant case are virtually indistinguishable from the facts of Castille.
However, we believe this case involves an important factual distinction from the Castille case. In Castille, the plaintiff obviously intended and expected to receive excess damages from the LPCF [Fund], as evidenced by the fact that the plaintiff amended his petition to add the LPCF [Fund] immediately after the settlement. However, in the instant case, there is no evidence that the plaintiffs intended and/or expected to receive excess damages from the LPCF [Fund]. In fact, the plaintiffs in this case settled their claim against Dr. Mandich for only $31,500, an amount far below the $100,000 limit of liability. The plaintiffs obviously believed that the greater amount of liability in this case lay with Dr. Ernst; the jury saw the facts differently.
Moreover, we agree with the plaintiffs' argument that nothing in the Horil decision requires that the plaintiffs in the instant case meet the requirements of LSA-R.S. 40:1299.44(D) or suffer dismissal on an exception of no cause of action. The Horil decision clearly refers only to situations where the plaintiff intends and/or expects to recover excess damages from the LPCF [Fund]. For example, the decision states, in pertinent part as follows:
Recently, in Russo v. Vasquez, 94-2407, pp. 5, 6 (La.01/17/95), 648 So.2d 879, 882, we outlined the purpose and requirements of La. R.S. 40:1299.44(C). We noted there that, where a provider's insurer agrees to settle a claim against its insured but the claimant demands, from the Fund, an amount exceeding the $100,000 paid by the insurer, this statute requires the claimant to utilize a specific procedure. First, the claimant must file a petition seeking approval of the settlement and demanding additional damages from the Fund. La. R.S. 40:1299.44(C)(1). The Fund's oversight board must be served with a copy of that petition at least ten days prior to the filing, La. R.S. 40:1299.44(C)(2), and may within twenty days agree or object to the amount demanded, La. R.S. 40:1299.44(C)(3). Then, if the oversight board, the claimant, and the insurer of the health care provider cannot agree on the amount to be paid by the Fund, the court must conduct a trial to determine the amount of the victim's damages exceeding the sum already paid by the health care provider or his insurer. La. R.S. 40:1299.44(C)(5). Where the insurer has paid its policy limits of $100,000, the court shall consider the liability of the provider as admitted and established for purposes of approving a settlement or determining the amount, if any, to be paid by the Fund. La. R.S. 40:1299.44(C)(5).
In the case sub judice, by viewing Horil's 1985 settlement as not then implicating the Fund and as being narrowly controlled by La. R.S. 40:1299.42(D)(5), the court of appeal disregarded the special requirements of La. R.S. 40:1299.44(C). In instances where the claimant expects to ultimately recover from the Fund despite his settlement of the provider's liability, this latter statutory provision mandates the procedure that the claimant must closely follow: In the present matter, at the time of seeking court approval of his settlement with the named defendants. Horil obviously sought to reserve his right to further recovery from the Fund. In such circumstances. La. R.S. 40:1299.42(D)(5) does not license a separate settlement vehicle. Instead, it is clear that the specifics of La. R.S. 40:1299.44(C) govern.
95-0967, at 5, 663 So.2d at 700 (footnote omitted).
Thus, we find that Horil requires compliance with the procedural requirements established by LSA-R.S. 40:1299.44(C) only when the circumstances indicate that the plaintiff expected and/or intended to recover excess damages from the LPCF [Fund].
In circumstances, such as the instant case, where the plaintiff clearly did not expect or intend to recover excess damages from the LPCF [Fund]and especially where, as here, the settlement with the qualified health care provider is far less than the $100,000 limit the provisions of LSA-R.S. 40:1299.42(D)(5) apply. This conclusion is based on the language of LSA-R.S. 40:1299.44(C) and the Supreme Court's decision in Horil, and on consideration of the well-accepted rule of statutory construction which demands that courts give effect to all language where possible. See In re Succession of Toncrey, 98-2342, p. 2 (La.App. 4 Cir. 12/9/98), 725 So.2d 59, 60. If we applied LSA-R.S. 40:1299.44(C) to the instant case, LSA-R.S. 40:1299.42(D)(5) would have no effect.
Thus, the final question to be decided is whether the plaintiffs in the instant case fulfilled the requirements of LSA-R.S. 40:1299.42(D)(5). The LPCF [Fund] suggests that the plaintiffs did not meet the requirements of that provision because the record contains no evidence that the LPCF [Fund] was given notice of the plaintiffs' settlement with Dr. Mandich. The LPCF [Fund] also suggests that any notice received was "insufficient." However, as noted by the plaintiffs, LSA-R.S. 40:1299.42(D)(5) contains no time limit for giving written notification of a plaintiff's settlement with a qualified health care provider to the LPCF. Moreover, the form of the notice is not specified.
In the instant case, the fact that the LPCF [Fund] received notice of the settlement with Dr. Mandich is easily inferred. Most importantly, the lawyers who represented Dr. Ernst at trial are members of the same firm as the lawyers that represent the LPCF [Fund] on appeal. Moreover, the petition for intervention filed by the LPCF [Fund] on June 28, 1996 references the May 24, 1995 settlement with Dr. Mandich. Under the circumstances, we find that the requirements of LSA-R.S. 40:1299.42(D)(5) were met. Accordingly, the exception of no cause of action filed by the LPCF [Fund] is DENIED. [Emphasis added.]
[4] Coleman should make his claim to the Patient's Compensation Fund Oversight Board for further action and recovery of his future medical care and related benefits claims. The Board has exclusive authority to pay, reject, settle, and monitor all claims and to administer the fund from which all claims are paid.